# BOWER v. LUNNEY et al.—178 S. W. (2d) 91.

Eastern Section.  May 26, 1943.

Petition for Certiorari denied by Supreme Court, October 16, 1943.

88

90

Fowler & Fowler, of Knoxville, for appellants.

Mark Webster and Grimm & Tapp, all of Knoxville, for appellee.

HALE, J. This suit involves the right of the complainant Mary A. Bower to inherit the estate of her alleged father Thomas J. Donahue, who died intestate on December 22nd, 1938, a resident of Knoxville. Mrs. Bower claims to be his legitimate child by Anna Kirk. If so, she takes his estate; if not, it passes to his nephew the defendant Dan Donahue, as his nearest of kin.

The Chancellor found the overwhelming weight of the testimony was in complainant's favor. The defendants Ellen Lunney, administratrix, and Dan Donahue, have appealed and jointly assign errors on such holding and questioning the Chancellor's ruling on objections to certain evidence offered by the parties. Mrs. Lunney, although a half-sister of Dan Donahue, was not related to the intestate. She has vigorously opposed complainant's claimed right of inheritance and attended the taking of depositions in New York and other places. She and her brother are represented by the same counsel and it is evident she is doing all she can to further his interests. They insist the complainant is not the natural child of the intestate, but even if so, is illegitimate, and has no right to inherit.

There is no record evidence of the marriage, and the status of the complainant depends largely upon filiation

and declarations by Mr. Donahue and proof of his co-habitation with the mother in Chattanooga for a few months before the complainant's birth. He was generally regarded as a bachelor.

The Kirk and Donahue families resided in Knoxville, were of sturdy Irish stock and members of the Mother Church. There is some evidence the Kirk family was wealthier and had a higher social status than the Donahues. One of the witnesses speaks of the Kirks as "Kid Glove" Irish, and of the Donahues as "Shanty" Irish. Be this as it may, Anna Kirk gave birth to an illegitimate child in 1875. The paternity of this first child was ascribed to Charles E. Crockett and resulted in a bastardy proceeding against him.

The complainant was born to Anna Kirk on May 27th, 1879. Bastardy proceedings were instituted against Thomas J. Donahue and are hereafter being referred to. According to the complainant, her mother told her they were removed by William Kirk, father of Anna, to Philadelphia, to live with the Kilroys (Mrs. Kirk's people) when she was less than two weeks old. This testimony was not objected to and there is no evidence to the contrary. Shortly thereafter the complainant was placed by her mother with Mr. and Mrs. Kern, who were excellent foster parents to her. The certificate of baptism shows she was baptized in the Roman Catholic Church as Mary Donahue, the daughter of Thomas J. Donahue and Anna Kirk, on May 28th, 1882, at St. Nicholas Church in Wilkes-Barre, Pa. There is evidence showing it was the custom of the Church to use the maiden name of the mother in such record. The foster parents were of limited means and it is uncontradicted that Thomas J. Donahue contributed to the support and education of this child so

as to give her more than she would have otherwise obtained. However, she went under the name of Mary Kern and was married as such in 1903 and moved to New York. In 1905 she went to Knoxville to visit the Kirks. While at Mass she was seen by Mr. Donahue, who later 'phoned her saying he was her father and asking her to meet him. She did so and he told her he was her father, that he was present when she was born, that he had supported her, that he and her mother were married, that it was "a bad break" for him when they were not permitted to live together, that at the time of her birth there was so much confusion going on he had to run out of town, expecting the mother to be with him, and that "he and my mother should have been allowed to live peacefully with me."

When the daughter was about fifteen or sixteen years of age the mother told her that she and Mr. Donahue were married. Mr. Donahue told complainant's husband he worked at Chattanooga in the mills and "how different things would have been if he had not been separated from her (Anna) and the child was not taken from him," and further, in speaking of his property, said that if Mrs. Bower survived her Aunt Ellen, his sister, everything was hers and she would have it all. The complainant testified that when her mother was on her deathbed in 1904 her father William Kirk, who had come from Knoxville, "went in there and looked at her and started to cry and said 'I did all this' and he had me by the hand and I was crying and he said 'Anna I never should have done this, I broke up a happy home,' " and the mother's last words were "Tom, Tom, Tom." It should be here said that the mother, as Anna Kirk, married Pat McFadden on January 1st, 1882. In doing so she falsely

stated she was born in Ireland. Possibly, it was because of her fear for having done this she never thereafter went to Church or attended Mass. She lived with Mr. McFadden until her death and had children by him. There was no divorce from Mr. Donahue in Tennessee and there was no record of a divorce in Philadelphia, although the search was confined to Donahue and the record discloses the name was often spelled Donohue.

After the contact was established between Mrs. Bower and Mr. Donahue in Knoxville he visited her in New York some six or eight times and she visited him in Knoxville six or seven times. They would greet each other with a hug and a kiss and a pat on the back and their partings were sad and tearful. He sent her money regularly up until about four years prior to his death, giving her as much as $300 at one time. He bought her a piano at a cost of $500, a coat costing $700, and, in addition, gave her various articles of jewelry. They exchanged photographs and kept up a correspondence for many years. He always signed as ''Uncle Tom.'' Some of these letters are in the record and show a paternal interest in her welfare. At first, when they were together, she called him ''Uncle Tom because this was what his nephews called him;'' subsequently she called him ''Dad'' and he would speak to her as ''Daughter.'' He told one of his renters, R. E. Mape, he had one wife who had fooled him and he never wanted another. To another tenant, Mrs. Pearl Laws, he said his wife was dead but that he had a daughter who lived away from him. He told Mr. Laws his wife was dead but that he had a daughter who lived in New York. To Zelma Kirk, the wife of Anna's nephew, he said he and Anna were in a run-a-way marriage and that the complainant was his

daughter, and further that it was because William Kirk had taken Anna and the child to Philadelphia his marriage was not generally known. To Mrs. Artie Taylor McKeehan he stated he nearly got shot when he eloped with his wife, that the license was obtained at LaFayette, Georgia, but they were married at Rossville, where they lived a short time before removing to Chattanooga, where he worked in a foundry; that when he married Mr. Kirk was rich and he but a poor boy, but that he had made money and could leave his daughter well fixed. It is shown that the courthouse and all records at LaFayette were subsequently destroyed by fire.

■ ■ John Lucas, who said he was 80 years of age when his deposition was taken in 1940, testified that in the middle or latter part of 1878 he was working at Chattanooga for the South Treadager Rolling Mill and became acquainted with Thomas J. Donahue, a fellow employee, who introduced him to his wife, formerly a Miss Kirk from Knoxville, that they were together once or twice a week thereafter for some three months. There was a yellow fever epidemic then and the witness left town. Several years thereafter he saw Mr. Donahue in his saloon at Knoxville and is positive he was Tom Donahue, that Donahue and his wife lived in the Dodge Boarding House at Chattanooga and that he introduced this woman as his wife to various persons. He further testified he was born in 1860 and was nineteen years of age when he knew Mr. and Mrs. Donahue and that he thought that Donahue was a year or two older than he. His testimony is assailed by the appellants as being false and probably perjured. First it is said the South Treadager Iron Company was not incorporated until 1889 and this is shown by the certified copy of charter filed in

evidence. From this it is said that as the alleged occurrence detailed by Mr. Lucas was in 1879 when he was working for the South Treadager Rolling Mills, this demonstrates the falsity of such testimony. If we assume the South Treadager Rolling Mill and the South Treadager Iron Company are one and the same concern we may explain this by the indiscriminate use of a name which attaches to a place of that sort, for instance, the present Farragut Hotel in Knoxville is sometimes referred to as the "Imperial," because a hotel of that name at one time stood on the site of the present Farragut Hotel. This is demonstrated by counsel's apparently innocent confusion of those names in the examination of the witness Milwee, and we, for this reason, cannot regard the testimony of Mr. Lucas as being perjured. His sister testified he was born in 1864 instead of 1860 as claimed by him, and filed a photostatic copy of the Bible record which gives his birth as 1864, but it was excluded by the Chancellor. Although this copy shows on its face that the various entries were made at the same time, the proof shows they were in the writing of the father who has been dead many years.

"The time and purpose of making entries in family Bibles which are offered in evidence may bear not only upon the weight, but upon the competency, thereof as evidence. It is generally conceded that the entries must have been made at the time the event happened or within some period of time thereafter so far remote from the purposes of the suit in which they are given in evidence as to prove that they were not made for the purposes thereof, or with the particular litigation in view. The mere fact, however, that an entry is not made at or very soon after the occurrence of the event recorded is not

98

of itself a ground for excluding it, although it may affect its credibility.'' 20 Am. Jur. "Evidence," Sec. 950, page 801.

■■ We think the record should have been allowed in evidence but, while affecting it does not destroy the testimony of John Lucas. There was no "Child Labor Law" in effect in 1879 and it may be that, even though he were mistaken as to his age, he could have still been employed at that time. Instead of being older, Donahue was a little younger than the witness.

■■ The appellants offered in evidence the judgment in the bastardy case against Charlie Crockett, growing out of the birth of Anna Kirk's first child. This was excluded by the Chancellor. The record in this cause, aside from such judgment, shows the birth of such illegitimate child. The judgment was admissible only to show as a part of Anna Kirk's history it was charged that she gave birth to a bastard child. This is otherwise established in the record and the Chancellor's action now presents a moot question.

The appellants also offered in evidence the judgment in the bastardy case against Thomas J. Donahue. It was excluded by the Chancellor and is as follows:

"Monday Morning, July 21st, 1879.

The State of Tennessee,

vs.

Thomas J. Donahue.

No. 1478.

Bastardy.

"Came the deft. in his proper person and by attorney and files his affidavit asking an issue to be made to try the said charge of bastardy, and the same is accordingly done—and the court having heard the proof in the case

and argument of counsel, is of opinion that the defendant is guilty as charged in the warrant, and it is therefore adjudged the father of the bastard child begotten on the body of Anna Kirk and born in Knox County on the 27th day of May, 1879. It is further considered by the court that the State of Tennessee, for the use of Knox County, have and recover of the said Thomas Donahue the sum of $40.00 for the maintenance of said child for the first year, $30.00 for the 2nd year and $20.00 for the 3rd year, making in all the sum of $90.00, together with all the costs in this case and execution is hereby awarded for costs.''

■ We think this judgment was admissible in evidence, not as an adjudication which would be final and binding on the child involved, but only as evidence of the family history that such a charge was made against but denied by him, and, further, in rebuttal to the statements subsequently made by the parents.

■ The remedy conferred by bastardy proceedings is purely statutory. Our statutes are found in the Code at Sections 11936 to 11957, both inc. These statutes contemplate that the female, a single woman, might be brought or voluntarily appear before the magistrate either before or after the birth of the child and on oath accuse the defendant of being its father. When this is done:

''Upon the hearing before the county court, the person so complained against or accused as aforesaid, shall be adjudged the reputed father of the child, unless he filed his affidavit clearly setting forth that justice requires an issue to be made to try the truth of such charge, in which case it is the duty of the court to hear proof and deter-

mine the matter as right and justice may appertain." Code, Sec. 11946.

The record in this case does not show when, if ever, the woman made such accusation, although we may presume she did so because of the issuance of the warrant. The judgment shows the defendant "files his affidavit asking an issue to be made." What was this issue? Did he deny having relations with her during the statutory period? Or did he deny the baby would become a county charge, or did he assert that the mother was not a single woman, but to the contrary, was his wife? Any one of these would have been a valid defense if sustained. The papers have been lost. Only the judgment remains. If his defense was that he was her husband, this can be reconciled with the subsequent declarations made by him and by her that they had been married. If they were married it was before the birth of the baby, for in less than two weeks thereafter she was moved to Philadelphia and, so far as the record shows, never thereafter saw Thomas J. Donahue. It is proper to state in this connection, however, that by record entry in this bastardy proceeding made a few days prior to the entry of the judgment before mentioned, the case was continued on application of the defendant, to allow the taking of the deposition of George Norman in Hamilton County. A witness shows Miss Kirk kept company with a Norman boy. The record does not disclose that the deposition was taken, or, if taken, its contents. It may have been that he intended to prove by this witness that he, the witness, had had relations with the female within the statutory period, or it may be that he intended to prove by him that he, the defendant, was married to her and lived with her as man and wife in

Chattanooga. Any inference we may undertake to draw from this is mere conjecture.

■ While the statute contemplates the female shall make the charge on oath, which in turn authorizes the inference that Anna Kirk made such charge, this must be considered in the light of her subsequent declarations and then weighed with all the other facts and circumstances in the case. This inference as to the charge having been made on oath is somewhat weakened because the record shows the child was born May 27th, 1879, and the mother was removed in less than two weeks thereafter to Philadelphia, but there is no record of the bastardy proceeding until the latter part of the following July. We do not know when or at whose instance the warrant was issued.

■ We do not understand learned counsel for the appellant's claim the judgment in the bastardy case was such an adjudication as would bind the child in any subsequent litigation involving its right of inheritance. Our law does not judge any man before it hears him and knows what he does.

"A judgment in a court of limited and inferior jurisdiction against defendant in a proceeding for his willlful neglect and failure to provide for the proper maintenance of his wife and minor child is, notwithstanding the legitimacy of the child has been placed in issue, conclusive only as to the liability of defendant for support and is without effect on matrimonial actions or in determination as to property rights." 10 C. J. S., Bastards, Sec. 115, p. 196.

In a somewhat similar case involving the right of inheritance, the New York Court of Appeals held the judgment in a suit brought by the father for the seduc-

tion of his daughter was not admissible in evidence on the claim of her child to inherit from the putative father. Eisenlord v. Clum, 126 N. Y. 552, 27 N. E. 1024, 12 L. R. A. 836.

If these people were married under a license obtained at LaFayette, Georgia, as stated by Mr. Donahue, and as the records have been destroyed, it would not be possible to furnish record evidence of the marriage. What would be the next best evidence? Wouldn't it be the statements and declarations of the principals? It will be remembered, according to Mr. Donahue, it was a run-a-way marriage and, if there were any witnesses, it is probable they were strangers and had nothing more than casual interest in the ceremony. It would indeed be difficult to find any such witnesses or to locate the Justice of the Peace who performed the ceremony or who would re-. member the names of the strangers after the passage of all these years.

In 1 Jones on Evidence, Sec. 312, p. 584, it is said:

"While declarations of members of an illegitimate's mother's family have been held not to be admissible to prove the existence of illegitimate relationship, the weight of authority holds that declarations of a deceased father, as well as deceased mother, are admissible either as to the legitimacy or illegitimacy of their own children."

In 7 Am. Jur. (Bastards), Sec. 27, pp. 646-647, it is said:

"As a result of the modern tendencies to relax the common law rule that an illegitimate child is filius nullius and incapable of inheriting; the weight of authority now is that to prove the parentage or status of the child with respect to legitimacy, it is competent to introduce declarations of the deceased mother or of deceased members

of her family, as well as those of the deceased father or of members of his family.''

See also 35 Am. Jur. ''Marriage,'' Sec. 213, pp. 319-320.

In prosecutions for bigamy or unlawful cohabitation a certified copy of the marriage license and return shall be sufficient proof of either or the first or second marriage, but in the absence of such record the testimony of any bystander who witnesses the marriage and the public acknowledgment of the party to be charged, shall be competent evidence as to either of such marriages. See Code, Sec. 11182. Finney v. State, 40 Tenn. 544, in which it was held the declarations or confessions of the accused as to the marriage without the production or accounting for the nonproduction of the license, were competent and would sustain a conviction. See also Crane v. State, 94 Tenn. 86, 28 S. W. 317.

The statement of Donahue to Lucas during the cohabitation with appellee's mother was admissible as a part of the res gestae, and his subsequent declarations of marriage were admissible under the rule allowing such evidence to establish pedigree. Eisenlord v. Clum, 126 N. Y. 552, 27 N. E. 1024, 12 L. R. A. 836.

It seems clear to us (1) that Thomas J. Donahue was the natural father of the complainant, (2) that he clearly recognized her as being his daughter and by this filiation gave rise to the presumption of legitimacy (Whipple v. McKew, 166 Tenn. 31, 60 S. W. (2d) 1006) and (3) by his declarations and those of the mother of the child, established they were married.

It is evident there was a tremendous explosion in the Kirk family when this child was born. For the appellants it is urged that it was because Anna Kirk was

giving birth to another bastard babe, and this seems to be sustained by the bastardy proceeding before referred to. For the appellee it is insisted that this was brought about by the fact that Anna Kirk had married a person of an inferior social status. This is hardly plausible in view of the fact that the girl had theretofore given birth to an illegitimate child and her standing naturally had been injured thereby. If we are to indulge in conjecture, it may be that a better explanation would be that Anna Kirk was with child and married shortly before its birth. This theory would sustain the declarations of the parties as to the marriage and by the same token explain the explosion in the Kirk household and the bastardy proceedings flowing therefrom, which, as before pointed out, may have been instituted prior to the birth of the baby or the marriage of the parties. Of course it is well known under our law that if the parents are married, even a moment before the birth of a child, it has a status of a legitimate.

In this connection we may point out that in the bastardy case against Charlie Crockett for the birth of the first child, the record shows the judgment was paid to Anna Kirk, but the record is silent as to what occurred under the judgment against Thomas J. Donahue.

█ █ The evidence adduced by the appellants was largely negative in its nature, that is, it was shown by some of the older Irish people in Knoxville, including Johanna Ferrietor and Teresa Clancy, that Thomas J. Donahue had the reputation of being a bachelor, but this was excluded by the Chancellor. We think he was in error in this, but do not believe that such testimony is of such weight when taken in connection with all the

other facts of the case, to overturn the conclusions herein announced.

■ It was shown by the city directories of Chattanooga for the years 1876 and 1877 that the South Treadager Iron Company was not listed therein for those years. We think these records were admissible, but we have heretofore undertaken to demonstrate that even though there was no such company in existence in 1879 the witness may have fallen in error as to the name of the company he worked for at that time.

■ There are numerous assignments of error as to the admission or rejection of certain proof offered by the parties. The second assignment relates to the action of the Chancellor in admitting in evidence, over appellants' objection, a newspaper item appearing in the Knoxville Journal under date of December 24th, 1938, relating to the death of Mr. Donahue and stating he was survived by a daughter, Mrs. Bowers, the complainant. Mrs. Bowers was very rigidly cross-examined on the matters testified by her and the intimation was thrown out that she had been laying ground for the assertion of her claim of inheritance. The newspaper item in question was admissible, not so much as to substantiate her claim but to show she was asserting the claimed right of inheritance. Especially is this true because the administratrix paid a collateral inheritance tax and too, had advanced to her half-brother Dan Donahue certain portions of the estate. Assignment three relates to the testimony of the husband of the complainant who testified that he had no knowledge of the marriage of Tom Donahue to Anna Kirk only as Mr. Donahue told him. As before pointed out, the declarations and admissions of a party are admissible to establish a marriage and we think this evidence was ad-

missible for that purpose.  By assignments four to eleven, both inclusive, the appellants' questioning of the action of the court in admitting the testimony of the witness Robert B. Eley, Pearl Laws, Clarence E. Laws, Mrs. James B. Kirk and Mrs. Artie Taylor McKeehan, with reference to his marriage with Anna Kirk, the birth and paternity of the complainant, etc.  As before pointed out, these declarations were admissible and the Chancellor was not in error in these particulars.  By the twelfth to fifteenth assignments, both inclusive, the appellants question the action of the court in excluding the testimony of the witnesses Johanna Ferrietor and Teresa Clancy regarding the reputation of Thomas J. Donahue, etc.  We believe this testimony was admissible as a part of the reputation of Thomas J. Donahue and Anna Kirk, to be considered in the light of all the testimony in the case. The sixteenth assignment relates to the Chancellor's exclusion of the copy from the family Bible of the Lucas family, and has heretofore been passed upon by us.  The seventeenth assignment relates to the action of the Chancellor in excluding the city directories for 1876-77 and has been passed upon by us.  The eighteenth assignment has been waived.  The nineteenth assignment relates to the action of the Chancellor in holding the baptismal certificate was admissible only to establish the fact and date of baptism.  This is ordinarily the rule.  32 C. J. S., Evidence, Sec. 727, p. 633.  It was offered as proving the age of Mr. Donahue, about which there is no serious question.  The same applies to the twentieth assignment relating to the exclusion of an affidavit executed in 1892 in which is set forth the age of Mr. Donahue.  It was excluded by the Chancellor but relates to a matter about which there is no controversy.

The twenty-first assignment relates to the admissibility of the records in the bastardy case and has heretofore been passed upon.

The twenty-second assignment relates to the exclusion of the baptismal record of Dan Donahue, the defendant, about which there is no controversy and is immaterial.

The twenty-third and twenty-fourth assignments are considered to be immaterial. The twenty-fifth goes to the action of the Chancellor in excluding the record in the bastardy case against Chas. Crockett. We have heretofore found that Anna Kirk gave birth to an illegitimate child in 1875. It results that this assignment raises an immaterial issue.

The twenty-sixth assignment goes to the action of the Chancellor in excluding the following testimony of Christine Collins:

"Q. From these older people what did you learn as to the reputation of Anna Kirk as to whether or not she had one or more children out of wedlock? A. Well I remember them talking about her having two children you know."

Even if she qualified to testify as to pedigree her statement as to the birth of the complainant was too vague and indefinite to constitute error.

The twenty-seventh and twenty-eighth assignments go to the action of the Chancellor on matters that are immaterial or have hereinbefore been settled.

The twenty-ninth assignment goes to the action of the Chancellor in excluding the testimony of Mrs. Christine Collins that Mr. Donahue had the reputation of never having been married. We have found that he was generally regarded as a bachelor, so this assignment is immaterial.

■ The thirtieth and thirty-first assignments relate to the exclusion of that part of the testimony of Mr. Walsh as set forth that certain papers destroyed by the administrator had "had no value." This would be a mere conclusion. He could say what papers were destroyed and it was for the Court to say if they had any value.

■ From the entire record, and on the rulings on evidence as corrected herein, we are of the opinion that the complainant sustained the burden of showing she was the legitimate child of the intestate and entitled to take his estate. While the question is not free from doubt, there is such an accumulation of coincidences and undisputed facts and disputed facts established by the weight of the proof, which when taken together multiplies the convincing quality of the entire case.

There are many inconsistencies; there are many spots left in the shadows; but these things, after the lapse of so many years, more tend to sustain than to destroy the evidence on the principal issues. If Mr. and Mrs. Donahue were not married, they falsified to these witnesses, the strongest of whom are not interested, or else we must brand these unimpeached and apparently truthful witnesses with the stigma of perjury.

Able counsel has interestingly discussed various matters of fact and law which would unduly lengthen this opinion if embodied herein. It is sufficient to say we have considered them carefully in arriving at the conclusion announced.

The thirty-second assignment goes to the action of the Chancellor in holding the appellant liable for the difference between the direct inheritance tax for which she was liable and the collateral inheritance tax paid by her.

█ She knew that the complainant was the putative daughter of deceased and was claiming or would claim the estate. If she paid more tax than was due, she did it with full knowledge of the facts and she, not the estate, should suffer, if there is any loss. She will be held liable for this excess but will be subrogated to the right of the estate to apply for a refund.

The thirty-third and final assignment goes to the action of the Chancellor in refusing an appeal when he announced his interlocutory decree fixing the rights of the parties and ordering her to deliver the estate to the Master and adjudging she was liable for rents she collected on the real estate of her intestate.

██ The decree was not final and the allowance of the appeal was in the discretion of the Chancellor. Code, Sec. 9038. We find no abuse of that discretion.

█ The defendant was properly removed as the administratrix. She was the ardent supporter of her brother in his claim to the estate. She used her position to further his interest to the injury of the rightful owner. There could be no harmony of action between her and the owner. See Patterson v. Tate, 141 Tenn. 607, 213 S. W. 981; Pritchard on Wills, Sec. 593.

██ There is no merit in her claim that she as administratrix should not account for the rents collected by her. The bill charges she had been collecting rents from the date of her appointment, and in her answer she admits this and says the rentals were deposited in a fund kept separate from her accounts as administratrix. While she had no legal right, as against the heir, to collect the rentals accruing after her appointment, she did so and should account therefor in this proceeding. She will not be heard to take advantage of her own wrong.

The decree of the Chancellor is affirmed and the cause remanded for execution of the reference ordered by him.

The cost of appeal will be paid by the appellant Dan Donahue and the surety on his bond. The appeal was solely for his benefit and he should pay the cost thereof.

McAmis and Burnett, JJ., concur.