# MELTON v. ANDERSON et ux.—222 S. W. (2d) 666.

Western Section. November 24, 1948.

Petition for Certiorari denied by Supreme Court, March 11, 1949.

Feuerstein, Fleet & Feibelman, of Memphis, for appellants.

W. H. Fisher, of Memphis, for appellee.

ANDERSON, P. J. This is an ejectment suit involving the title to a house and lot in the city of Memphis. The Chancellor's decree was for the complainant. The defendants appealed.

The property in question was formerly owned by Laura Melton and occupied by her as a home. She died intestate in March, 1940. She was a widow, her husband having predeceased her some 28 years or thereabouts. The complainant claims that he is the son of Laura Melton; that she had no other children; and hence that he took the property by descent. The defendants deny that the complainant is a son of Laura Melton and aver that she had no children; that she was survived by her brother, Oscar Sims, who is her sole heir at law; that Sims conveyed the property to one Latting, who in turn conveyed to the defendants as tenants by the entireties.

Complainant contends not only that he is the son of the deceased, Laura Melton, but that her brother Sims and those claiming under him are estopped to say otherwise by reason of a certain proceeding in the probate court of Shelby County, instituted by Laura Melton wherein she averred that the complainant was her son.

The theory of the defendants with respect to the relationship of the complainant and L. A. Melton, as set forth in the answer is as follows:

"Complainant, who claims to be the son of L. A. Melton, is truly the son of a colored woman named Jeannette and whose last name is unknown, and was born to her in Memphis, Shelby County, Tennessee, at or about September 1924.

"That upon his birth, Jeannette, natural mother of complainant surrendered custody of him to Sallie Fizer who cared for the complainant for one month. That thereupon with the consent of the natural mother of complainant, Sallie Fizer surrendered the custody of complainant to L. A. Melton."

The defendants sought to support this theory by the testimony of five Negro women, at least one of whom

seems to have been more or less engaged in the business of disposing of illegitimate children unwanted by their mothers. The witnesses do not support the version of the matter as set out in the answer in all its details; but notwithstanding the discrepancies they all testify substantially that the complainant was not the son of L. A. Melton but the illegitimate child of another woman who was taken from his mother by one of the witnesses at birth and after a few months turned over to L. A. Melton, who reared him.

The Chancellor held that "it appears to the court from the preponderance of the evidence that Timothy Melton is not the natural son of, and was not born to Laura A. Melton; and but for the principle of judicial estoppel applicable to and applied by the court in this cause, the court would so find as a fact."

There is no controversy about the facts alleged to give rise to the judicial estoppel. As stated in the bill, they are as follows:

"Oscar Sims, the brother of L. A. Melton, and uncle of complainant came to Memphis, when L. A. Melton died, and took possession of the property for and on behalf of complainant, whom he took to his home in Abilene, Texas. It was not until just before the bill was filed that complainant learned that Oscar Sims had done with the property.

"Oscar Sims, and all those who claim under him, are estopped by judicial records from claiming that complainant is not the son of L. A. Melton. In the record of the Probate Court of Shelby County, Tennessee, there is a proceeding, entitled, 'Guardianship of T. M. Melton,' being Cause No. 41750 R. D. (Ended No. 33,152); a petition for appointment of guardianship was filed by Charles

Melton, April 6, 1940, which recites that L. A. Melton is the mother of T. M. Melton (who is the present complainant). In this cause Oscar Sims, on June 22, 1940, filed a petition for the removal of Charles Melton as guardian. In this petition, Oscar Sims recites that he is the next friend, and uncle of T. M. Melton. No question was made of the former petition stating that L. A. Melton was his mother.

"Also, L. A. Melton, and all who claim under her, are estopped by judicial records from making any claim that she is not the mother of T. M. Melton, the complainant. In the Probate Court of Shelby County, Tenn., there is a cause entitled, 'L. A. Melton Gdn. of T. M. Melton, a Minor,' being No. 33,297 R. D. (Ended No. 22033), wherein L. A. Melton filed a petition for her appointment as guardian, in which she stated that she was the mother of T. M. Melton; and she made oath to this petition, and the Court acted thereon, and named her guardian, and she served as such; settled a claim for damages, received the money in land, received allowance therefrom; all as shown by the records in said cause."

At the time of the trial the complainant was 23 years of age. He testified that he was born at Memphis, and thas his mother was the deceased L. A. Melton, or Laura Melton; that he remembered her from the time he was a very small child and lived with her until she died; that she treated him as her child, supported him. Asked whether she claimed to be his mother, he replied, "That is all I have ever known." He said that the fact that she was his mother had never been questioned by anyone; that after the death of Laura Melton her brother, Oscar Sims, came to Memphis and "He taken charge of every-

thing''; that Sims took him to his, Sims' home in Texas, where he remained for some nine months until he enlisted in the United States Army, from which he was discharged in October, 1945; that he enlisted in the Army in January, 1941, and since he was then under 18 years of age he had to get a "written statement" from Sims as his uncle to enable him to enlist; that upon his discharge from the Army he came back to Memphis and for the first time discovered that his uncle had sold the property. This suit resulted.

Referring to the guardianship proceeding instituted by L. A. Melton in the probate court in 1931, the Chancellor held as follows: "The Court is of the opinion, and so holds, that the rule of judicial estoppel applies, and that the aforesaid record inconclusive upon the question as to whether complainant was the son of L. A. Melton, and by reason of estoppel he must be taken as the son and heir of L. A. Melton. This estoppel bound her and her estate, so that on the instant of her death intestate, her real estate passed by descent case to complainant as heir. This estoppel bound L. A. Melton, and binds those who claim to be the heirs of L. A. Melton, and those tracing title through them. The title to the property vested at once in complainant, and did not, and could not vest, in Oscar Sims who had no title to pass to his grantees."

The defendants insist that whatever would be true as against Laura Melton if she were living and sought to repudiate her oath in the probate court proceedings, her sworn statements therein made are not binding on her heir, Oscar Sims, or on them as his grantees. It is contended that in this respect there is a distinction between judicial estoppel and equitable estoppel arising

out of the fact that the latter is based solely on equitable considerations and prejudice to the one invoking the doctrine must be shown; whereas the latter is based solely on public policy which forbids that a party be allowed to repudiate his solemn oath. Williams v. Nottingham, 19 Tenn. App. 162, 84 S. W. (2d) 114, and cases cited.

A general statement of the doctrine of judicial estoppel is that where one states on oath in former litigation, either in a pleading or in a deposition or on oral testimony, a given fact as true, he will not be permitted to deny that fact in subsequent litigation, although the parties may not be the same. Tate v. Tate, 126 Tenn. 169, 212, 148 S. W. 1042, and cases cited. The opinion in the case of Sartain v. Dixie Coal & Iron Co., 150 Tenn. 633, 266 S. W. 313, is virtually a treatise on the subject, but what is there said must be considered in the light of subsequent decisions. Among these are the cases of Black Diamond Collieries v. Deal, 150 Tenn. 474, 477, 265 S. W. 985, and Helfer v. Mutual Ben. Health & Accident Ass'n, 170 Tenn. 630, 96 S. W. (2d) 1103, 1105, 113 A. L. R. 921. The latest expression is contained in Rose & Co. v. Snyder, 185 Tenn. 499, 519 et seq., 206 S. W. (2d) 897 wherein the Supreme Court adopts the able opinion prepared for this court by Judge Felts, Presiding Judge of the Middle Section of the Court, when that case was before us.

The doctrine in no sense depends upon prejudice to the party invoking it. Upon the contrary it rests solely on public policy which exalts the sanctity of the oath. The object is to safeguard the administration of justice by placing a restraint upon the tendency to reckless and false swearing and thereby preserve the public

confidence in the purity and efficiency of judicial proceedings. Hamilton v. Zimmerman, 37 Tenn. 39, 40, 46; Sartain v. Dixie Coal & Iron Co., supra.

In Helfer v. Health & Accident Ass'n., supra, to which we are referred by the defendants, it was held that an affidavit filed with the Pension Commissioner in an ex parte application for an increase in a pension could not be used as a basis for judicial estoppel. The reason assigned was that the Pension Bureau not being a court and the Commissioner of Pensions not being a judicial officer, the application for an increase in the pension did not constitute a judicial proceeding.

It is true that after this ground had been stated, the learned special judge who prepared the opinion apparently approved the rule in Behr v. Connecticut Mut. L. Ins. Co., C. C., 4 F. 357, which seems to have been interpreted as holding that a false statement under oath in a judicial proceeding, which injured no one, does not give rise to a judicial estoppel.

This view, it seems to us, overlooks the reason underlying the doctrine of judicial estoppel as it has been developed by a long line of decisions in this state. As said, the rule rests not upon prejudice to the individual, but prejudice to the administration of justice and hence to society, which would result if a litigant were allowed to obtain an advantage for himself, or attempt to do so, by willfully swearing one thing one time, and obtain another advantage, or attempt to do so, by willfully swearing precisely the opposite another time, with no explanation of the inconsistency and with the possibility of prevailing in both instances. To countenance such a situation would be to regard with complacency a violation of the sanctity of the oath, and bring our system into disrepute.

We are not persuaded that by referring to the case of Behr v. Connecticut Mut. L. Ins. Co., our Supreme Court intended by the decision in the Helfer case to depart from the well-established rule reaffirmed many times, that any party whether prejudiced or not, may invoke the doctrine of judicial estoppel.

The Behr case is easily reconcilable with previous decisions in this state in that it appeared in that case that in addition to a lack of prejudice to anyone, the oath relied upon as a basis for application of the doctrine "was made inadvertently, inconsiderately and by mistake". See Black Diamond Collieries v. Deal, 150 Tenn. 474, 165 S. W. 985.

But it is contended that due to its inherent nature the doctrine of judicial estoppel should be confined to the party making the oath and not extended to his privies. With respect to this particular type of estoppel, the point has not been expressly ruled in this jurisdiction but the principle of several decided cases furnishes the answer. The general rule is that when parties, if living, would be estopped, their heirs and privies in estate are likewise estopped. LaRue v. Greene County Bank, 179 Tenn. 394, 414, 166 S. W. (2d) 1044, and cases cited. An analogy is found in cases involving the fraudulent transfer of land wherein it is held that an heir, though perfectly innocent himself, is bound by the conduct of his ancestor in making a fraudulent conveyance. Battle v. Street, 85 Tenn. 282, 2 S. W. 384; Thomas v. Hedges, 27 Tenn. App. 585, 183 S. W. (2d) 14.

No good reason occurs to us why a different rule should apply in a case of judicial estoppel. Indeed, if there is any difference it should be in favor of a stricter application of the latter, because public policy is in-

volved to a greater extent. The greater the potential adverse consequences of false swearing, the more effective will be the doctrine as a deterrent; or, to state it differently, if the heir were allowed to repudiate the ancestor's oath, the effectiveness of the doctrine would be impaired.

It is no answer to say that the death of the party making the oath renders it more difficult to show that the false statement was inconsiderately made. If this be true, it ought not to be allowed to prevent the application of a salutary doctrine of public policy. Difficulties of proof have never been allowed to have that effect. Cf. Battle v. Street and Thomas v. Hedges, supra.

The effect of the estoppel upon the title to the property and the manner in which it may be used by the complainant in aid of his case remains to be determined.

The present case being an ejectment suit, to obtain relief the complainant must show a perfect legal title in himself. He cannot recover upon a comparison of titles with the defendant. Lowry v. Whitehead, 103 Tenn. 396, 53 S. W. 731; Hubbard v. Godfrey, 100 Tenn. 150, 47 S. W. 81. He must establish title in himself, regardless of what the defenses of the defendant may be. McLemore v. Charleston & M. R. Co., 111 Tenn. 639, 69 S. W. 338. And this means the legal title; an equitable title is not sufficient in ejectment. Campbell v. Campbell, 40 Tenn. 325; Evans v. Belmont Land Co., 92 Tenn. 348, 21 S W. 670; Edwards v. Miller, 51 Tenn. 314.

The defendants contend that to hold that the estoppel prevented the legal title from vesting in their predecessor in title, Oscar Sims, as the sole heir at law of Laura Melton, and caused it to vest in the complainant would be in contravention to the statute of frauds.

The authorities dealing with this question involve estoppel in pais, but the principle is no less applicable to judicial estoppel. There seems to be a conflict of views as to whether the title of land is ipso facto divested by estoppel in pais. 31 C. J. S., Estoppel, Section 150, page 438; 19 Amer. Jurs. 743 and 831, 832. But the difference of opinion is of no significance in the light of modern equity jurisprudence. Even if it be true that, strictly speaking, the legal title does not pass by virtue of the estoppel, a court of equity has ample jurisdiction to divest and vest the title in accordance with the maxim that equity considers that done which should have been done. 31 C. J. S., Estoppel, Section 150, page 439, and cf. Evans v. Belmont Land Co. 92 Tenn. 348, 364, 21 S. W. 670; Fair v. Curry, 180 Tenn. 650, 656; Covington v. McMurry, 4 Tenn. Civ. App. 378.

But in the present case the Chancellor manifestly being of the opinion that it was not necessary, did not undertake by his decree to divest and vest the legal title in the complainant. This being true, the defendants contend that since the estoppel cannot be held to have prevented the legal title from vesting in their predecessor in title, the suit cannot be maintained for want of the requisite proof of title in the complainant. In this connection, they rely upon the rule that estoppel cannot be invoked to establish facts but only to prevent parties from relying upon facts which do exist. This is a general rule. Stated somewhat differently, it is said that ordinarily while estoppel may be urged for the protection of a right, it can never be invoked to create a right. McLemore v. Charleston & M. R. Co., 111 Tenn. 639, 663, 69 S. W. 338; Henry County v. Standard Oil Co., 167 Tenn. 485, 71 S. W. (2d) 683, 93 A. L. R. 1483.

The latter case furnishes an illustration of the application of the rule. There the county trustee sued the defendants to recover certain funds collected by them under a void act of the legislature, requiring them to collect "2c tax on each gallon of gasoline sold in said county" and to report any pay over to the trustee monthly the sums collected. The basis of the complainant's action was alleged to be estoppel. The theory was that even though the act was void, the defendants had collected and held the monies which did not belong to them and could not in good faith retain the same. The court, after holding the act void, applied the rule that a right not otherwise existing cannot be created by estoppel. The rationale of the decision is that the complainant was not shown to be otherwise entitled to the fund and therein lies the distinction between that case and this.

 Here, the complainant does not ground his right to the property upon estoppel; but upon the existence of his relationship to the deceased, Laura Melton. His contention is that the sworn petition of the latter filed in the Probate Court, and the proceedings thereon, are serviceable not only as grounds of estoppel but as evidence that Laura Melton was in fact his mother. The contention is sound. The question being one of pedigree, the declarations of Laura Melton were competent evidence of her relation to the complainant. Valley v. Lambuth, 1 Tenn. App. 547; Adcock v. Simon, 2 Tenn. App. 617, 623, 624; Overton v. Hardin, 46 Tenn. 375; Bowers v. Lunney, 27 Tenn. App. 87, 178 S. W. (2d) 91. See also Vaughan v. Phebe, 8 Tenn. 5.

The declaration of Laura Melton was corroborated by the undisputed evidence to the effect that the complainant lived with her and that she held him out as her son,

—so much so that the immediate members of her family, including her brother, Oscar Sims, regarded that to be the fact.

Wholly apart from any question of estoppel, this evidence and the sworn declaration of the deceased, nothing else appearing, was sufficient to establish the heirship. The question is therefore not one of the complainant's asserting a right created by estoppel, but whether defendants can be heard to challenge that right after it is prima facie shown by competent evidence. The analogies to be found in the decisions require a negative answer.

In Smith v. North Memphis Sav. Bank, 115 Tenn. 12, 89 S. W. 392, the marriage relation was involved. It was held that after the parties had lived together for many years as man and wife, the administrator of the husband's estate was estopped to deny the right of the woman to participate in the husband's estate as widow and distributee.

Gamble v. Rucker, 124 Tenn. 415, 137 S. W. 499, also involved the question of the existence of the marital relation. Although the court found there was an earlier legal marriage and the former wife was living when the second marriage was solemnized, it was held that the latter marriage would be presumed to be valid because the proof did not overturn the presumption indulged that the first relation had been dissolved by divorce. The children of the second marriage were accordingly held to be the legal heirs of the father and entitled to share in the estate with the children of the first marriage.

In Bohlen- Huse Coal & Ice Co. v. McDaniel, 148 Tenn. 628, 257 S. W. 848, 849, a proceeding under Workmen's Compensation statute, instituted by a father to recover

the statutory allowance for the death of his son, the employer contended that the son was illegitimate and that for this reason the father was not entitled to recover. The court found that the father and the mother had lived together as man and wife for 25 years although without any legal ceremony; that they had reared several children, occupied the same home, and in fact exemplified a perfect common law marriage. It was held that in these circumstances the marriage would be presumed and the defendant employer "cannot be permitted to deny that a valid marriage subsisted between Mose McDaniel and the mother of the deceased, in this case where the question is purely incidental." The case is instructive though not precisely in point because the question of the legality of the marriage arose incidentally and did not involve a controversy between persons claiming under conflicting rights of heirship.

The same result has been reached in cases involving the question of adoption. In Adcock v. Simon, supra, it was held that children being privies to an estate with their parents were estopped to deny an adoption where the parent had entered into a written contract to adopt another's child and had failed to do so. See also James v. Williams, 169 Tenn. 41, 82 S. W. (2d) 541.

In each of these cases the right asserted in the action arose not from the estoppel but from the particular relation which was shown to exist by competent evidence or presumption raised by law from the established facts; or from other equitable considerations arising out of contract. The doctrine of estoppel was employed merely to prevent the particular defendant or defendants from challenging the asserted right after its existence had been shown prima facie and independently of the doc-

trine. And that is the case here. If there had been no competent evidence that the complainant was the son of Laura Melton, the fact that the defendants would have been estopped to deny it if there had been such evidence would not have prevented a dismissal of the bill for the failure of proof of an essential fact. But there was no such failure of proof because, as already pointed out, the sworn declarations of Laura Melton in the probate court proceeding are competent evidence to show her relationship to defendant, and since the defendants are estopped to deny that relation, it must be regarded as having been established.

The result is that the decree of the chancellor is affirmed at the cost of the defendant.