STATE ex rel. AMMONS v. CITY OF KNOXVILLE et al.
—232 S. W. (2d) 564.

STATE ex rel. SCRUGGS v. CITY OF KNOXVILLE
et al.—232 S. W. (2d) 564.

Eastern Section   At Knoxville.   March 13, 1950.

Petition for Certiorari denied by Supreme Court, August 31, 1950.

S. F. Dye, Ben F. McAuley and R. R. Kramer, all of Knoxville, for complainants.

Richard L. Carson, of Knoxville, for defendants.

SWEPSTON, J. This appeal is by the City of Knoxville from a decree of the Chancellor holding that the resignation of two policemen, Ammons and Scruggs, were executed by them under duress.

The questions for decision raised by the assignments of error are:

(1) Whether they did resign under duress.

(2) If they did, are they guilty of laches barring them from relying on duress?

(3) Are they estopped judicially or equitably by reason of positions taken by them in certain proceedings participated in by them as is reflected on the face of the pleadings in same?

(4) Is this suit res adjudicata because of those former proceedings and the judgment of the Court of Appeals?

We believe it will be conducive to brevity and to an intelligible disposition of the case to relate at once in proper sequence both those matters which are not in dispute and our findings as to disputed questions of fact.

These two policemen had been on the force a number of years, Ammons since 1930 and Scruggs since 1936 when their troubles arose in May 1944. Their records were clean and they are given a good character in this record; each is married; up to the inception of this trouble each was working eight hours per day on the force and a like period for a private employer as guards at Appalachian Mills; one of them had attained the rank of sergeant.

May 10, 1944 the local newspapers carried stories to the effect that these men had been accused of having ac-

cepted a bribe of $300 for allowing a load of liquor to be unloaded at the Elks Home at the instance of an individual employed there. At this time George R. Dempster was City Manager of Knoxville and appears from the record to be an aggressive, dynamic person of considerable force and will, anxious and alert to do his job well. Upon learning of the accusation he immediately had these men brought in by the Chief of Police and in his presence and the presence of several other officials and a newspaper reporter he demanded the written resignations of the two as an alternative to his threats of criminal prosecution and of a trial under the civil service rules of the City Charter, after having heard the accuser's statement.

They refused to resign at that time. Formal charges under civil service rules were promptly brought and set for hearing. Complainants then consulted counsel and both they and counsel sought to pacify the City Manager and convince him of their innocence but to no avail. He was greatly agitated over the matter from the start and continued in the same frame of mind during the ensuing weeks; he was soon to come up for reelection and had no patience or taste for this potential scandal. Each time he was approached he would hear to nothing but their resignations. The civil service hearing was continued at the request of complainants and finally set for June 1, 1944. On that day before the time for the hearing complainants appeared with their attorney and executed the resignations. They testified they did so because they had worried and thought over the matter, that they were embarrassed for themselves, their wives and family and friends and did not know how they could establish their innocence, so they gave in.

Notwithstanding the resignations the criminal warrants which the City Manager had directed to be procured were issued the next day. This is strange indeed, because Ex. 9 is an affidavit of the accuser dated June 1 which exonerates the complainants. June 9 a preliminary hearing lasting eight hours was had in the General Sessions Court as a result of which complainants were found not guilty and the charges dismissed.

In the fall of 1944 Scruggs had a conversation with the City Manager who then stated that he had investigated the matter and was convinced they had been mistreated and he was going to have the error rectified. Pursuant thereto complainants' counsel filed petitions on January 17, 1945 with the City Council for restoration. A committee was appointed by the Council to investigate and report, but before the committee had completed the investigation petitioners by letter of January 23 addressed to the City Council withdrew their request, stating in effect that, although they had been completely exonerated by the affidavit of the individual by whom they were supposed to have been bribed, which affidavit was made and filed June 1, 1944 insofar as the City was concerned and by the hearing on the criminal charge in the General Sessions Court, they nevertheless had ascertained there was some opposition by certain members of the City council to their reinstatement; further "we fail to understand, in view of the above facts, why this opposition has developed, but since it has, and since we have, since the filing of this petition, been offered more lucrative positions, we hereby withdraw our application for reinstatement to the police force of the City of Knoxville".

This request for restoration was withdrawn because it was realized that the City Council had no authority to restore them, but a plan was agreed upon by counsel

for complainants and the Law Director of the City with the evident approval of the City Manager, and pursuant to that plan petitions for mandamus were filed in the Circuit Court on February 13, 1945 and judgments, that were actually agreed judgments though not so appearing on their face, were entered (R. 17 & R. 184) restoring the petitioners to duty. They were then transferred to the fire department with the understanding that after a short while they would be put back on their jobs as policemen and that they could not lose seniority rights.

At the insistence of the City Manager they omitted from the petitions for mandamus anything about the threats and coercion, so as to make it as mild as possible, because he had promised to take care of them, and these petitions leading to compromise judgments were the first step in that direction.

Sometime after the entry of those judgments the City appealed on the technical record to the Court of Appeals, which held as follows:

(1) That the mandamus petitions, in alleging that petitioners were accused by individuals and that "petitioner resigned his position . . . for the purpose of relieving the embarrassment, worry and trouble that was being heaped upon him, his family, friends and acquaintances and upon the City of Knoxville and its officials, including the two named herein as defendants. At the time he resigned . . . he did so as the result of the aforesaid circumstances," failed to charge the City with any wrongdoing and that, therefore, so far as the City is concerned, the resignations were voluntary;

(2) That therefore section 76 of the Charter provisions applies which is: "Whenever a policeman or fireman has in any way severed his connection by resigning or being removed or discharged from his service in the em-

ployment of the City, before he shall again be elected, he shall be required to stand a civil service examination just as any other applicant and subject to the same qualifications as required for new applicants'';

(3) That, if for any reason, the *resignation be held nugatory,* the City would still have the right to try the accused in the manner provided by the Charter, and that the courts are without power to determine the guilt or innocence of such employee with a view to restoration, except upon appeal after the Charter provisions have been carried out, citing State ex rel. Baker v. City of Knoxville, 166 Tenn. 563, 64 S. W. (2d) 17, holding that provisions of the City Charter may not thus be by-passed by an unauthorized resort to the courts and that the City itself cannot waive such charter provisions for the purpose of restoring such employee;

(4) That the judgments of the Circuit Court be reversed and the mandamus petitions be dismissed.

Shortly afterwards the present bill alleging duress for the first time was filed June 23, 1947 and after a hearing the Chancellor decreed as stated at the beginning of this opinion.

The City by its four assignments of error challenges the action of the Chancellor in finding duress, in holding that petitioners were not guilty of laches, nor estopped either equitably or judicially nor bound by res adjudicata in bringing the present suit.

We are of opinion that the evidence does not preponderate against the Chancellor's finding of duress existing up to the date when the resignations were finally signed, but, in fact, fully supports the decree.

The subject of ''Duress'' by threats is fully treated in 17 Am. Jur. p. 881 et seq.

On page 885 it is said: "It is generally held, however, that the threat must be of such a nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect and the act sought to be avoided must be performed by the person while in that condition; and that an act subsequent to the time when the threats were employed will not be considered as having been done under duress. *If, however, the threats were long continued, and the act which it is sought to avoid was done such a short time thereafter as to indicate that the mind of the person was still under the influence of the threats, it has been held that this will constitute an act done under duress*".

See Bogle v. Hammons, 49 Tenn. 136, 140, where the deed was executed a month or two after the threat was made to subject Bogle to the penalty of the Military order (1862) if he refused to accept Confederate money for his land.

Even though these men had the advice of counsel during the interval from May 10 to June 1, we are not willing to hold that this necessarily removed the effect of the continued threat of criminal prosecution with the consequent embarrassment and the apparent inability at that time to establish their innocence, which later was established.

█ The real question in these cases is not merely the nature of the threat, nor how the mind of a reasonably strong person would be affected, but it is what state of mind was induced in the victim. Blair v. Coffman, 2 Overt 176, 5 Am. Dec. 659; Loud v. Hamilton, Tenn. Ch. App., 51 S. W. 140, 144, 45 L. R. A. 400.

■ In view of subsequent developments above related we are of opinion that complainants were not guilty of laches, nor estopped either equitably nor judicially.

It is argued that the statements of the City Manager and of the Law Director were those of individuals and not binding on the City, with reference to the later occurrences. We do not subscribe to that view. If these men were wronged, it was not only because of the individual accuser but also because of the manner in which the representative of the City handled the charge. This was certainly the act of the City. Hence, when the same representatives of the City sought to make amends and correction of the wrong, it was likewise the act of the City; the representative simply went about it the wrong way.

It is argued that complainants are guilty of laches because two years elapsed before duress was charged. Also that there is judicial estoppel because of the sworn petitions for mandamus, the pertinent language of which is quoted, supra, in which they stated the facts as to their resignations, which language the Court of Appeals held to be a statement that the resignations were voluntary, citing Melton v. Anderson, Tenn. App., 222 S. W. (2d) 666.

■ ■ There can be no misapprehension at this date about the rule of judicial estoppel; as fully shown in that opinion the basis of the rule is not whether prejudice resulted to the other party but is the prejudice resulting to the administration of justice if a litigant were allowed to swear one way one time and a different way another. But it is equally conducive to the attainment of justice and hence just as important a part of the rule that the party be allowed to explain an ostensible incon-

sistency, or that the statement was made inadvertently, inconsiderately or by mistake.

There can scarcely be any doubt that the City is responsible for both the laches and the euphemistic averments of the language of the prior pleadings, of which it now seeks to take advantage. The same will not be permitted here.

■ The argument as to res adjudicata is to be resolved on the same basis. The Court of Appeals acted on what was before it, but the true facts did not appear because the City had not wanted them to appear and had so requested the complainants, who acted accordingly. The City is itself patently estopped to rely on these defenses.

We overrule all assignments and affirm the decree of the Chancellor with cost. Decree will be entered here accordingly.

Anderson, P. J., and Baptist, J., concur.