695 P.2d 1201

J.T. WOLFORD, dba Wolford Realty and C.B. Empey and Ilene B. Empey, husband and wife, Plaintiffs-Respondents, Cross-Appellants,

v.

Lloyd T. TANKERSLEY and Dora Gennette Tankersley, husband and wife, Defendants-Appellants, Cross-Respondents.

No. 13764.

Supreme Court of Idaho.

May 22, 1984.

On Rehearing Feb. 5, 1985.

Harold L. Ryan and Michael B. Sweet, Weiser, for defendants-appellants, cross-respondents.

Dale Smith, Fruitland, for plaintiffs-respondents, cross-appellants.

DONALDSON, Chief Justice.

In 1974, the plaintiffs-respondents, Mr. and Mrs. Empey, decided to sell four and one-half acres of their land. They retained Mr. Wolford, as their real estate agent. The defendants-appellants, Mr. and Mrs. Tankersley, purchased the property but three years later a dispute arose over the purchase price.

The events leading up to the dispute began when the Empeys attempted to sell a portion of their property for $18,000. The Tankersleys saw the property and testified that the Empeys told them to contact the Empeys' real estate agent, Mr. Wolford. After talking with Mr. Wolford, the Tankersleys offered to pay $2,500 and assign their interest in a land sale contract. The land was located in Oregon. This land sale contract had a balance owing of approximately $15,000 but was subject to a lien. Mr. Wolford informed the Empeys of this offer, and the Empeys informed Mr. Wolford that they would accept $17,500 for the property. However, the Tankersleys later claimed that they did not offer to pay $17,-500, because even though the land sale contract that was being assigned had a balance of $15,082.64, there was a lien on the contract totaling $7,443.85, leaving the Tankersleys with an equity of $7,638.79. They claimed they only intended to transfer this equity plus $2,500.

The agreement signed following the Tankersleys' offer to purchase the Empeys' land did not clarify the price. The parties signed carbon copies of the earnest money agreement, but neither party was present when the other party signed the agreement. This earnest money agreement contained two blanks for the purchase price. When the Tankersleys signed their copy, the blank left for the price at the bottom of the agreement was left blank. The only reference to price was in the first blank, where it was written that the buyers agreed to purchase the property for the sum of $2,500 plus their interest in a land sale contract.

After the buyers signed the agreement, they kept their copy and the real estate agent took the seller's copy, and filled in the second blank to read $17,500. Therefore, when the sellers signed the agreement, the first blank that had been filled in

still read that the price was $2,500 plus the assignment of contract, and the blank at the bottom of the agreement was now filled in to read that the price was $17,500.

There was no land sale contract prepared, but besides the earnest money agreement, there was an assignment of contract that stated the interest in the contract that was being assigned to the Empeys was subject to a lien. This assignment of contract was prepared by an attorney at the request of Mr. Wolford. However, a deed signed by Mrs. Tankersley, which conveyed the Oregon property to the Empeys as security, stated the consideration to be $17,-500. There was also a closing statement, which the Tankersleys denied receiving, that set out a purchase price of $17,500.

The Empeys first became aware that they were receiving approximately $7,300 less for the property than they had expected to receive when the contract was prepaid in full in April, 1978. The Empeys contacted Mr. Wolford and, after checking his papers he agreed in writing to pay the remainder of their loss. He eventually paid the Empeys $2,000.00 before he persuaded them to join him in filing suit against the Tankersleys.

The Tankersleys said they first became aware of the problem in November, 1978, when they were contacted by the Empeys' attorney. They claimed that the equity in the assigned contract plus $2,500 was all they ever intended to pay for the land, and that they were not aware the asking price was $18,000, or that the Empeys agreed to sell it to them for $17,500.

Mr. and Mrs. Empey and Mr. Wolford filed a suit against Mr. and Mrs. Tankersley. The trial court, sitting without a jury, found that the Tankersleys were unjustly enriched and ordered them to pay the Empeys the reasonable market value of the property on the date of the sale, plus interest. The property was valued at $17,413. The trial court also found that Wolford was not entitled to any relief. This appeal followed. The issues raised by the appellants, Mr. and Mrs. Tankersley, are: (1) whether a party can bring an action for unjust enrichment if an express contract exists between the parties; (2) whether the knowledge of an agent should be imputed to the principal; and (3) whether the Empeys elected their exclusive remedy when they took a promissory note signed by Mr. Wolford.

Concerning the first issue, the Tankersleys argue that if an express contract exists, a party cannot bring an action for unjust enrichment. Following this, they claim that a contract existed between the parties, and therefore, the trial court should not have found for the respondents on the claim of unjust enrichment.

■ This argument, that an express agreement precludes the application of the equitable remedy of unjust enrichment, is incorrect because this Court has held that even though an agreement exists, unjust enrichment may be imposed. *Hixon v. Allphin,* 76 Idaho 327, 281 P.2d 1042 (1955). The existence of an express agreement does not in and of itself signify that an action for unjust enrichment cannot be brought. Rather, only when the express agreement is found to be enforceable is a court precluded from applying the equitable doctrine of unjust enrichment in contravention of the express contract. *Chandler v. Washington Toll Bridge Authority,* 17 Wash.2d 591, 137 P.2d 97 (1943); *see Hixon, supra.*

■ Concerning the enforceability of the agreement, no land sale contract was entered into evidence, but the record indicates that the parties intended the earnest money agreement to act as their final statement of the terms, and there was nothing in this agreement to show that the parties contemplated a land sale contract would be entered into. *See Luke v. Conrad,* 96 Idaho 221, 526 P.2d 181 (1974). However, even though the earnest money agreement was intended to operate as the contract between the parties, to constitute a contract under Idaho law there must be a distinct understanding common to both parties. *Hoffman v. SV Company, Inc.,* 102 Idaho 187, 628 P.2d 218 (1981); *Mitchell v. Siqueiros,*

99 Idaho 396, 582 P.2d 1074 (1978); *Turner v. Mendenhall,* 95 Idaho 426, 510 P.2d 490 (1973).

■ The trial court in it's decision and order for partial summary judgment on behalf of the defendants found no mutual assent as to any purchase price between the Empeys and the Tankersleys. We agree.[1] The earnest money agreement signed by the buyers and sellers contained carbon copies. The buyers signed the agreement first, and at that time the $17,500 price was not set out in the agreement. The only reference to price was the statement that the buyers would assign their interest in a land contract. When the sellers signed the agreement, the buyers' signature was at the bottom and the real estate agent had written in the price of $17,500.

One problem with the agreement then is that two copies of the earnest money agreement existed with only one of the copies containing the figure $17,500. That alone may not be critical to the enforceability of the agreement, but in addition, the land sale contract, which was to be assigned to the Empeys as part payment of their land, as referred to in the earnest money agreement, did not specify a value nor state that the contract being assigned was subject to a lien. Because of this, the trial court was correct in finding that no enforceable contract existed and in applying the equitable doctrine of unjust enrichment.

Unjust enrichment is a modern designation for the older doctrine of quasi-contract. *Smith v. Smith,* 95 Idaho 477, 511 P.2d 294 (1973). "The essence of the quasi-contractual theory of unjust enrichment is that the defendant has received a benefit which would be inequitable to retain at least without compensating the plaintiff to the extent that retention is unjust." *Hertz v. Fiscus,* 98 Idaho 456, 457, 567 P.2d 1, 2 (1977). This Court has also stated that, "[t]he substance of an action for unjust

enrichment lies in a promise, implied by law, that a party will render to the person entitled thereto that which in equity and good conscience belongs to the latter." *Smith, supra,* 95 Idaho at 484, 511 P.2d at 301.

The parties stipulated that the Empeys expected to receive $17,500 for the property, and Mr. Empey testified that he became aware of the lien but "didn't think it had anything to do with the fifteen thousand eighty-two." In concluding that the Tankersleys were unjustly enriched, the trial court stated that "[t]he Tankersleys passively accepted the real property, knowing that under the sales documents they would not have to pay $7,361.21 of the purchase price which the sellers expected to receive and which they, at the time they made their offer, expected to pay."

This Court has often stated that the trial court's findings of fact will not set aside unless they are found to be clearly erroneous. I.R.C.P. 52(a); *Credit Bureau, Incorporated of Georgia v. Harrison,* 101 Idaho 554, 617 P.2d 858 (1980). This Court has also stated:

"The rules of civil procedure clearly indicate that regard is to be given to the special opportunity of the trial court to judge the credibility of witnesses who appear personally before it. I.R.C.P. 52(a). Where there exists sufficient evidence in the record to support the lower court's findings on credibility, this Court sitting without the firsthand observation necessary to evaluate witness credibility, will not set aside those findings."

*Id.* at 556, 617 P.2d at 860.

Concerning the finding that the Tankersleys knew the Empeys expected to receive $17,500, and that they initially intended to pay that amount when they made their offer, Mr. Wolford testified that he stated the purchase price to the Tankersleys, and Mrs. Tankersley testified that Mr. Wolford might have told her the purchase price. However, she also testified that she did not

---

1. Even though this finding was not specifically set out in the trial court's findings of fact and conclusions of law, we hold that lack of mutual

assent was implicitly found by the trial court before determining that the defendants were unjustly enriched.

remember hearing the purchase price and her husband testified that he never asked, and was never told, the purchase price. However, a letter, signed by the Tankersleys' attorney, that was admitted into evidence, stated that "[t]hey [Mr. and Mrs. Tankersley] met with Mr. Wolford and at that time were told by Mr. Wolford that the Empeys were asking approximately $17,000 for this piece of property." The Tankersleys denied this part of the letter. Mr. Wolford also testified that Mrs. Tankersley represented the contract, which was being assigned to the Empeys, to be worth about $15,000.

In addition to the testimony, a deed conveying the Oregon property to the Empeys as security was entered into evidence by the respondents. It recited the consideration to be $17,500. The deed was signed by Mrs. Tankersley. However, she testified she did not read the deed before signing it. A closing statement that set out a purchase price of $17,500 was entered into evidence. The real estate agent testified that he mailed a copy of this statement to the Tankersleys. The Tankersleys denied receiving a copy of this statement. A copy of the title insurance policy that stated there was title insurance for $17,500 was also entered into evidence. The real estate agent again testified that he mailed a copy of this policy to the Tankersleys. The Tankersleys again denied receiving a copy.

■ In light of the special opportunity of the trial court to judge the credibility of the witnesses, we hold that the evidence, although conflicting, is not clearly erroneous and is sufficient to support the lower court's finding that the Tankersleys knew the Empeys expected to receive $17,500, and that the Tankersleys initially planned to pay that amount when they made their oral offer to Mr. Wolford, but that when the offer was set out in writing, they took advantage of the ambiguities in the earnest money agreement.

After reviewing the facts and circumstances of this case, we hold that the trial court was correct in finding for the plaintiffs Empeys on the claim of unjust enrichment. The defendants accepted and retained a benefit that would be inequitable for them to retain without paying the reasonable fair market value. *Hixon v. Allphin*, 76 Idaho 327, 281 P.2d 1042.

Secondly, the Tankersleys argue that Mr. Wolford, as agent for the Empeys, knew that the Tankersleys were not aware the asking price was $17,500, and that they did not offer to purchase the property for this amount. Because Mr. Wolford was acting as the agent for the Empeys, the appellants claim that this knowledge should be imputed to the Empeys and that they should suffer the loss under the contract.

■ We agree that a principal can be liable for the contracts made by his agent. *General Motors Acceptance Corp. v. Turner Insurance Agency, Inc.*, 96 Idaho 691, 535 P.2d 664 (1975). However, in this case, it has been determined that no enforceable contract exists. Therefore, since there is no enforceable contract, the acts of the agent can give rise to no contractual liabilities.[2]

Finally, the appellants argue that the Empeys elected an exclusive remedy when they took a promissory note signed by Mr. Wolford. This Court has set forth three conditions essential to the proper application of the rule on election of remedies:

"(1) There must be in fact two or more coexisting remedies between which the party has the right to elect; (2) the remedies thus open to him must be inconsistent; and (3) he must, by actually bringing his action or by some other decisive act, with knowledge of the facts, indicate his choice between two inconsistent remedies."

*United States Fidelity & Guaranty Co. v. Clover Creek Cattle Co.*, 92 Idaho 889, 899, 452 P.2d 993, 1003 (1969) (quoting *Largilli-*

---

**2.** A principal can also be liable for torts committed by his agent, but the appellants did not raise the issue of possible tort liability.

*ere Co., Bankers v. Kunz*, 41 Idaho 767, 772, 244 P. 404, 405 (1925)).

We need not address the first and third element since an examination of the facts relevant to the second condition reveals that the remedies are not inconsistent, but rather, independent. Under such circumstances a party may pursue one or all of the remedies so long as he obtains but one satisfaction. This Court stated that the election of remedies is "generally limited to a choice by a party between inconsistent remedial rights; the assertion of one being necessarily repugnant to or a repudication of the other." *United States Fidelity and Guaranty Co., supra*, 92 Idaho at 899, 452 P.2d at 1003, (quoting *Largilliere Co., Bankers v. Kunz*, 41 Idaho 767, 772, 244 P. 404, 405 (1925)).

Inconsistency of remedies is defined not as an inconsistency between the remedies, but as an inconsistency in the facts relied upon. "To make actions inconsistent one action must allege what the other denies, or the allegation in one must necessarily repudiate or be repugnant to the other." *Taylor v. Robertson Petroleum Co.*, 156 Kan. 822, 137 P.2d 150, 154 (Kan.1943). In this case, the Empeys did not allege inconsistent facts, but rather, were seeking two consistent remedies. Therefore, because this condition was not fulfilled, we find that the doctrine of election of remedies is inapplicable.

Finally, the respondents argue that the trial court erred in refusing to award attorney fees. The trial court denied attorney fees to the respondents on the basis that the defendants did not defend the action frivolously, unreasonably or without foundation. The respondents claim that this ruling is incorrect because I.R.C.P. 54(e)(1), which mandates that the trial court only award attorney fees if an action is pursued or defended frivolously, was not yet in effect when this action was filed. However, before March 1, 1979, it was within the trial court's discretion as to whether or not to award attorney fees. *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977). We find no abuse of that discretion. Therefore, we uphold the trial court's decision. However, since this is an action for unjust enrichment which is an equitable remedy, it would be inequitable for the Empeys to recover judgment from the Tankersleys for the $2,000 previously paid by Wolford. *See Peavey v. Pellandini*, 97 Idaho 655, 551 P.2d 610 (1976). Therefore, the judgment against the Tankersleys is reduced by $2,000.

Judgment for the Empeys affirmed as modified.

Costs to respondents.

No attorney fees on appeal.

BAKES, J., and McFADDEN, J. Pro Tem., concur.

SHEPARD, Justice dissenting.

I view the facts of this case in a different light than does the majority. Simply stated, they are these. The Empeys desired to sell their property and employed an agent Wolford to do so. The Empeys agreed to pay a commission of six per cent of the purchase price to Wolford and presumably have paid that amount in full. As the agent of the Empeys, Wolford contacted the Tankersleys, who offered to pay $2,500, together with *their interest in a sales contract* on land located in Oregon. The agreement was reduced to writing, wherein the Tankersleys agreed to purchase the Empey property for $2,500 plus the *Tankersleys' interest* in the land sale contract. Wolford had an attorney prepare an assignment of the land sale contract, which stated that the Tankersleys' interest in the contract was subject to a lien. The Tankersleys executed that assignment of their contract interest to the Empeys.

Although at some point in the proceedings Wolford was charged with the knowledge that the Tankersleys' land sale con-

tract had a lien against it, he added a term to the purchase money agreement, which agreement had already been executed by the Tankersleys. The added term indicated that the total purchase price of the Empey property was $17,500. There is no indication in the record whether such action by Wolford was inadvertent or a deliberate method of enhancing his real estate commission. Likewise, there is absolutely nothing in the record to indicate, nor is it contended, that Wolford's action was authorized by the Tankersleys or that the Tankersleys had knowledge of Wolford's change in the contract.

At that point in time, Wolford was clearly the agent of the Empeys, and there is no contention otherwise. In my opinion, Wolford owed a fiduciary duty to the Empeys, and the Empeys were responsible for and chargeable with the knowledge and actions of Wolford. If, as is uncontroverted, Wolford misrepresented to his principals Empeys what was essentially an offer by the Tankersleys to purchase the Empey property, that matter is between the agent Wolford and the principals Empeys; and if the Empeys sustained damage therefrom, a cause of action might well lie against Wolford.

It was not until some four years later, after the transaction was consummated and the Tankersleys had in turn sold the Empey property to a third party, that the Empeys discovered the effects of Wolford's misrepresentation. Following negotiations between Wolford and Empey, a written agreement was executed between them, wherein it is recited:

"Whereas the real estate sale was closed by J.T. Wolford with the sellers receiving only an assignment of contract in the net amount of $7,638.79 . . .

"Whereas J.T. Wolford acknowledges the error in the closing transaction and wishes to make payment to the Empeys for the amount not received plus seven and one-half per cent interest to date."

It was thereafter agreed "that J.T. Wolford accepted responsibility for the error and agreed to pay Mr. and Mrs. Empey the amount for the loss *occasioned by his error."* Thereafter, Wolford executed a promissory note, in favor of the Empeys, in the amount of $9,431.55, with interest thereon at seven and one-half per cent per annum.

Over the years between the execution of the contract and the initiation of this lawsuit, the Empeys each and every month received a statement from the escrow company holding and handling the land sale contract which the Tankersleys had assigned to the Empeys. Those monthly statements reflect that the purchasers under that contract remitted each month the amount due to the escrow company; that the escrow company each month deducted $138.50, which was then paid against the lien held by Pioneer Savings; and that the balance of the money was then remitted to the Empeys. Therefore, I deem the evidence to be overwhelming and conclusive that, above and beyond the knowledge of Wolford, the Empeys knew, from the assignment itself and from the escrow statements, that there existed a lien in favor of Pioneer Savings against the land sale contract assigned by the Tankersleys to the Empeys. No action was taken by Wolford or the Tankersleys for approximately four years, when Wolford persuaded the Empeys to join him in the instant action, alleging fraud and misrepresentation on the part of the Tankersleys and demanding $2,000 in damages to Wolford, approximately $7,500 in damages to the Empeys, punitive damages in the amount of approximately $9,500, together with costs and attorney's fees.

In my mind, the following legal conclusions flow inexorably from the above-recited facts. Wolford was the agent of the Empeys. He acted within the scope of his agent's authority when he negotiated a sale of the Empey property with the Tankersleys. Arguably, and according to Wolford's deposition, Wolford checked with the lienholder to determine the amount of the

lien against the Tankersleys' contract sale. Beyond question, the assignment of that contract from the Tankersleys to the Empeys indicated the existence of and the amount of that lien. That information for the assignment was given to the attorney by Wolford.

The case law is replete with holdings to the effect that a principal is charged with the knowledge acquired by an agent acting within the scope of his authority on behalf of the principal. This basic postulate of agency law has been long accepted in Idaho. In *Branom v. Smith Frozen Foods of Idaho, Inc.*, 83 Idaho 502, 511, 365 P.2d 958, 963 (1961), the Court stated the rule as follows:

"It is a general principle of the law of agency, that the principals are bound by the acts of their agents which fall within the apparent scope of the authority of the agents and that the principals will not be permitted to deny the authority of their agents against innocent third parties, who have dealt with those agents in good faith. *White v. Doney*, 82 Idaho 217, 351 P.2d 380 [1960] ...

\* \* \* \* \* \*

"In *Stout v. McNary*, 75 Idaho 99, 267 P.2d 625, 627 [1954], the rule is stated as follows:

'The principal cannot claim that an agent with apparent authority to act had no such authority when he claims benefits of such agent's acts. He cannot approve the part that is beneficial to him and reject the part that creates a burden.' "

And in *John Snowcroft & Sons Co. v. Roselle*, 77 Idaho 142, 145–146, 289 P.2d 621, 623 (1955), we held the evidence sufficient to show an agent's apparent authority to act on the principal's behalf, and we explained:

"The purchase and receipt of merchandise by the Summitt Supply Company from respondent over a long period of time and admitted payments thereon by

appellant was sufficient evidence from which a jury could find that appellant had clothed his agent or representative ... with actual or apparent authority to order and receive the merchandise in question.

"In 2 Am.Jur., Agency, page 86, sec. 104, it is said:

'\* \* \* where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority, \* \* \*'

"See *Hunsaker v. Rhodehouse*, 77 Idaho 119, 289 P.2d 319 [1955]. A principal is bound by the acts of his agent within the scope of his apparent authority. *Bevercombe v. Denney & Co.*, 40 Idaho 34, 231 P. 427 [1924]; *Arens v. Scheele*, 63 Idaho 189, 119 P.2d 261 [1941]; *Clark v. Tarr*, 75 Idaho 251, 270 P.2d 1016 [1954]."

Thus, it is clear that an agent's acts are, by definition, those of his principal. The Empeys, having clothed Wolford with power to bind them by his, Wolford's, acts, were estopped to deny the validity of the representations made by Wolford to the Tankersleys. *See, e.g., Fowler v. Uezzell*, 94 Idaho 951, 500 P.2d 852 (1972); *Clements v. Jungert*, 90 Idaho 143, 408 P.2d 810 (1965); *Commercial Ins. Co. v. Hartwell Excavating Co.*, 89 Idaho 531, 407 P.2d 312 (1965); *White v. Doney*, 82 Idaho 217, 351 P.2d 380 (1960); *Arens v. Scheele*, 63 Idaho 189, 119 P.2d 261 (1941). *See generally,* Seavey, Law of Agency § 75 (West 1964); Reuschlein and Gregory, Agency and Partnership, Chapter 9 (West 1979).

Restatement (Second) of Agency § 161A (1957), states the rule as to causes of action against a principal, based on the agent's acts, in contract:

"§ 161 A. Unauthorized Acts of Special Agents

A special agent for a disclosed or partly disclosed principal has no power to bind his principal by contracts or conveyances which he is not authorized or apparently authorized to make, *unless the principal is estopped,.* or unless:

(a) the agent's only departure from his authority or apparent authority is

i. in naming or disclosing the principal, or

ii. in having an improper motive, or

iii. in being negligent in determining the facts upon which his authority is based, or

iv. *in making misrepresentations;* or

(b) the agent is given possession of goods or commercial documents with authority to deal with them." (Emphasis added.)

Restatement (Second) of Agency § 257 (1957) states the rule in tort law:

"§ 257. Misrepresentations; in General

A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is:

(a) authorized;

(b) *apparently authorized;* or

(c) *within the power of the agent* to make for the principal." (Emphasis added.)

Hence, the Empeys are charged with knowledge of the lien existing against the land sale contract held by Pioneer Savings, and with the knowledge that, when the Tankersleys executed the purchase and sale agreement, it did not contain a sale price of $17,500, but rather stated the Tankersleys' offer of $2,500 in cash and their interest in the land sale contract as payment for the Empey property. If mistake there was, there is no showing that it was on the part of the Tankersleys. If mistake there was, it was unilateral on the part of the Empeys and resulted only from the actions of their agent Wolford.

The contract, as executed by the Tankersleys, clearly indicates their intent to pay $2,500 in cash and assign their interest in the land sale contract in return for the Empey property. While the Empeys may have intended to get $17,500 for their property, they are chargeable with the knowledge of Wolford, who knew they would only receive the amount offered by the Tankersleys. This is not an action for rescission of a contract or for reformation on the grounds of mutual mistake brought within a reasonable period of time. Rather, it is an action brought after the contract has been fully executed, under the guise of unjust enrichment, asking the court to penalize the Tankersleys for the action, either inadvertent or deliberate, by Wolford, the agent of the Empeys. Since the action is equitable in nature, the court, in my judgment, should have allowed the executed contract to stand. The Tankersleys obtained the property for the amount of their offer. While the Empeys did not receive what they now contend they anticipated (ignoring their knowledge of the lien furnished by the assignment and the monthly statements), they have been made whole by Wolford. The loss, if any there was, has appropriately fallen on the shoulders of Wolford, who precipitated the problem.

Finally, I have reviewed the record and find a total lack of evidence, clear and convincing, or otherwise, of any fraud, misrepresentation, or overreaching on the part of the Tankersleys.

Therefore, I dissent.

BISTLINE, J., concurs.

BISTLINE, Justice, dissenting.

My concurrence in the opinion of Shepard, J., is based on my agreement with that which he has written. In particular, I am impressed with his view, expressed near the end of his opinion, that the Empeys "have been made whole by Wolford." I

further agree that "If mistake there was, it was unilateral on the part of the Empeys and resulted only from the actions of their agent Wolford." As stated earlier in his opinion, and a fact which cannot be gainsaid, "Wolford was the agent of the Empeys." And, at the beginning of his opinion, it is beyond cavil that "the Empeys were responsible for and chargeable with the knowledge and actions of Wolford." The district court in a memorandum decision had reached the same conclusions, which will be discussed, *infra,* but nevertheless managed to place full liability upon the Tankersleys for Wolford's actions, which went totally unexcused, and were patently inexcusable. The basic issue, however, not addressed by Justice Shepard, and wholly ignored in the majority opinion, is the failure of the district court to come to grips with an affirmative defense pleaded by the Tankersleys, the resolution of which is dispositive of the appeal, and has been since we heard oral argument and took the case under advisement many months ago. The opinion of Justice Shepard touches upon that issue where he says, above alluded to, that the Empeys "have been made whole by Wolford. The loss, if any there was, has appropriately fallen on the shoulders of Wolford, who precipitated the problem." But, whereas Justice Shepard concludes his opinion with the statement that his review of the record shows him "a total lack of evidence, clear and convincing, or otherwise, of any fraud, misrepresentation, or overreaching on the part of the Tankersleys," the awesome fact of this case is that the district court likewise absolved the Tankersleys, and thereafter yet declared their liability to the Empeys for the Tankersleys' having received a bargain at the expense of the Empeys, notwithstanding that long before Wolford persuaded the Empeys to join him in a suit against the Tankersleys, the Empeys had been made whole by Wolford! There never was such a law suit and such a misuse of the judicial system. But, one ought not be so critical, because on appeal to this Court a majority experiences no problem whatever in placing upon the actions and conduct of Wolford the Idaho Supreme Court stamp of approval. This the majority does in the face of an earlier Idaho case which, in accordance with all general authority on the subject, declares that Mr. Wolford cannot misuse the court system as he has done—which is the essence of the affirmative defense which was raised by the Tankersleys, and the edges of which the district court skirted around without penetrating to the heart. But again, one should not be critical of the district court which was faced with a seldom-seen situation, and had to tackle that problem single-handedly—as compared to the review of an appellate court blessed with *fine* legal minds each fortified and complemented with two more legal minds, and more compelling, a thousand-fold more time in which to consider. With those prefatory remarks by way of introduction, I submit the following which, in my view, is the only result obtainable in a proper disposition of this appeal. In particular it is necessary to focus on the nature of the proceedings below, taking care to observe that there were two different law-suits pursued by Mr. Wolford. The first was indeed, as Justice Shepard has noted, predicated upon allegations of Tankersleys' fraud, but also upon mistake. This proceeding was decided adversely to Wolford, who then regrouped, and charged in again with a new theory entirely inconsistent with the stance which he (and his persuaded co-plaintiffs, the Empeys) had taken in their first judicial encounter with the Tankersleys.

## I.

The Empeys listed their property for sale with Mr. Wolford. The Tankersleys became interested in the property, and thereafter dealing only with Wolford, stated that they would purchase and would offer a contract equity and $2,500. Wolford in turn advised the Empeys, and then prepared the Earnest Money Agreement, which the Tankersleys signed. The Agreement did not state the total amount of the pur-

chase price or the total of the amount being offered. Wolford then altered the Earnest Money Agreement so that it showed a total purchase price of $17,500 which was within $500 of the listed amount. In the altered form it was presented to and signed by the Empeys. Wolford took charge of bringing the transaction to a close, during the course of which he examined the escrowed contract receivable which the Tankersleys would trade together with $2,500 in cash. An attorney retained by Wolford prepared a document assigning the contract equity. The contract equity had a lien against it which was being paid off out of the monthly contract payments as they came in. The attorney who prepared the assignment had no contact with the Empeys or the Tankersleys. The assignment document was signed by the Empeys as well as by Mrs. Tankersley, the sole owner of the contract equity. It recited the contract balance due at $15,082.64, subject to the lien of the mortgage in the amount of $7,443.85.

The Empeys observed this and, upon calling it to Mr. Wolford's attention, were assured by him that the legal effect of the document was that the assignment would bring them in the $15,082.64 balance due. They sought no other advice, and would learn four years later that all they would and did receive from the assigned contract was the contract balance *less* the mortgage lien. They complained to Mr. Wolford, who immediately acknowledged his fault and reimbursed their loss with a promissory note, later replaced by a second note, and then a third note, discussed *infra*.[1] The Tankersleys were not in any way involved. Wolford paid $2,000 on the second note, as per its provisions and then induced the Empeys to join him in suing the Tankersleys on a count alleging their fraud and on another count alleging unjust enrichment arising out of mistake. The complaint specifically charged Tankersleys with fraudulent and intentional nondisclosure.

"IV. That Defendants intentionally and willfully failed to advise Plaintiffs J.T. Wolford and C.B. Empey and Ilene B. Empey of the true value of the Tankersley-Olson contract which was subject to said prior mortgage.

"V. That Defendants' representations of value to the plaintiffs J.T. Wolford, C.B. Empey and Ilene B. Empey were done willfully and with the intent that the Plaintiffs rely on the valuation of $15,000.00 for the Tankersley-Olson contract.

"VI. That Plaintiffs J.T. Wolford, C.B. Empey and Ilene B. Empey relied upon Defendants' representation of a $15,000.00 value for the Tankersley-Olson contract and were not aware of the false representations of the Defendants until April of 1978.

"VII. That Plaintiffs J.T. Wolford, C.B. Empey and Ilene B. Empey in reliance upon Defendants' statements, executed an earnest money agreement, closing statement, and warranty deed to the defendants.

**"VIII. As a result of the fraudulent conduct of the defendants, the Plaintiff J.T. Wolford has sustained damages in the amount of $2,000.00 to date. This results from his liability to Plaintiffs C.B. Empey and Ilene B. Empey for their loss due to the defendants' fraudulent actions and the Plaintiff J.T. Wolford's failure to detect these actions.**

"IX. That Plaintiffs C.B. Empey and Ilene B. Empey have sustained damages in the amount of $9,569.57 less the sum of $2,000.00 recovered to date from Plaintiff J.T. Wolford due to the fraudulent actions on the part of the defendants, Lloyd T. Tankersley and Dora Gennette Tankersley." R., pp. 3–4.

As an alternative cause of action the plaintiffs alleged the following:

"II. That the documents as prepared by J.T. Wolford for the closing of the sale between Plaintiffs C.B. Empey and Ilene B. Empey and Defendants Lloyd T. Tankersley and Dora Gennette Tankersley were incomplete.

[1]. See Appendix, *infra.*

"III. That Defendants Lloyd T. Tankersley and Dora Gennette Tankersley were aware of this mistake at the time they executed the closing documents on or about the 11th day of January, 1975.

"IV. That the mistake was not known to Plaintiffs J.T. Wolford, C.B. Empey and Ilene B. Empey until April of 1978.

**"V. That Plaintiff J.T. Wolford has recognized full liability to Plaintiffs C.B. Empey and Ilene B. Empey for damages sustained by them due to the mistake in the preparation of the closing papers.**

**"VI. That Plaintiff J.T. Wolford has paid the sum of $2,000.00 to date as partial payment for the damages suffered by Plaintiffs C.B. Empey and Ilene B. Empey.**

"VII. That the full amount of damages suffered by Plaintiffs C.B. Empey and Ilene B. Empey is the amount of $7,361.21 plus interest in the amount of $2,2098.36, for a total of $9,569.57.

"VIII. That the defendants, Lloyd T. Tankersley and Dora Gennette Tankersley, have been unjustly enriched in the amount of $9,569.57." R., pp. 5–6.

In passing on cross-motions for summary judgment the trial court, after reviewing the depositions and evidence which had been submitted, specifically found no triable issue regarding the following facts:

"1. The land sale was closed on January 14, 1975.

"2. In December 1974 Wolford prepared and obtained the Tankersleys' signatures on a Receipt and Agreement to Purchase the real property, in which the purchase price is set forth as $2,500.00 down and an assignment of the sellers' interest in a contract of sale of certain real property in Ontario, Oregon. (Exhibit 2, Deposition of Lloyd T. Tankersley.)

"3. Later in December 1974 Wolford presented to his principals, the Empeys, a copy of the Receipt and Agreement mentioned above, which he had altered by adding above the Tankersleys' signatures a promise to pay $17,500.00 for the

property. The Empeys signed the altered Receipt and Agreement. (Exhibit 4, Deposition of Lloyd T. Tankersley.)

**"4. The Empeys were never shown a copy of the unaltered Receipt and Agreement and the Tankersleys were never shown a copy of the altered one, before the sale was closed.**

"5. Before the sale was closed Wolford learned from the escrow holder that there was $15,082.64 remaining to be paid on the Ontario property, $7,443.85 of which was to be paid on a mortgage on the property, leaving a balance of $7,638.79 to be paid to the Empeys under the assignment. **Wolford did not communicate this fact to the Empeys.**

"6. Wolford retained Mr. Dwaine L. Welch, attorney at law, Payette, Idaho, to draft the necessary papers to complete the sale, handing him the two copies of the Receipt and Agreement before mentioned and his office notes setting forth the information stated in Paragraph 5 above.

"7. In the documents drafted by Mr. Welch, no provision was made by note and mortgage, by contract of sale, or by any other document to secure to the Empeys payment of any amount above the $2,500.00 down and the $7,433.85 to be received under the assignment of the contract on the Ontario property.

**"8. With knowledge of the documents as drafted Wolford, when questioned by the Empeys, replied in effect that the sales documents assured them they would received the full $17,500.00 less commission.** R., pp. 40–41.

In concluding that the Tankersleys were entitled to summary judgment on the fraud count, the trial court made these rulings, none of which have been challenged by the Empeys or by Wolford:

"No issue remains in this case as to the existence of an oral or written statement attributable to the Tankersleys regarding an offer or promise to pay a purchase price other than $2,500.00 down and assignment of a contract on the Ontario property.

"Likewise, no issue remains as to the existence of an oral or written statement attributable to the Tankersleys regarding the amount the Empeys would receive on the assignment of the contract on the Ontario property. **Where this is concerned Wolford conducted his own investigation into how much his principals would receive under the assignment.** Consequently the Empeys, as well as Wolford, would have no right to rely on any representations of the Tankersleys in this connection.

"Neither would the plaintiffs have a right to rely on any provision in the sales documents relating to purchase price or the amount the Empeys would received from the assignment of the contract on the Ontario property, unless the representations originated with Tankersleys and plaintiffs had not made an investigation of them. The record contains nothing in this category." R., pp. 41–42.

In holding that the Tankersleys were entitled to summary judgment on the mistake count, the trial court made these rulings:

"On the mistake of fact count, it is the law that Courts have power to reform contracts, or to rescind contracts and grant restitution where there is a mistake of law, a mutual mistake as to a material fact, or a mistake of fact by one party where the other party knew or as a reasonable person should have known of the mistake. Sparks v. Campbell, 99 Idaho 139, 578 P.2d 681.

"**There remains no question that Wolford knew there was no mutual assent between the Empeys and the Tankersleys as to any particular purchase price, and to the amount the Empeys would receive from the assignment of the contract. He also knew no provision was made in the sales documents for the payment of the obvious deficit of $7,638.79 in the sale price his principals expected to receive.**

"**As a matter of law Wolford's knowledge of these facts are imputed to his principals.** 3 Am.Jur.2d 635, Agency Section 273.

"The Empeys, having imputed knowledge of these facts, should not be heard to say that they are not facts, nor should they be permitted to claim lack of knowledge of them as a mistake of fact." R., p. 42.

In the same order which ruled in favor of the Tankersleys on the claims based on fraud and upon mistake, the court concluded that, notwithstanding that the same order had ruled out any unjust enrichment relief predicated upon mistake, that there was yet a third count which was raised by the facts, if not by the pleadings. The court's summary judgment order reasoned thus:

"Where a person wrongfully secures or passively receives a benefit which would be unconscionable for him to retain, unjust enrichment occurs. 66 Am.Jur.2d 1094 Restitution and Implied Content § 164."[2]

Wolford and the Empeys then filed an amended complaint which essentially followed the trial court's ruling. They charged the Tankersleys with passively getting a bargain—alleged to be an unjust enrichment. The Tankersleys, in answering the amended complaint, denied that they had knowingly received a bargain at the Empeys' expense. **Affirmatively, they alleged the defense that the Empeys had made a settlement with Wolford,** that such was an election of remedies and that the plaintiffs were estopped from suing them. The district court never directly ruled on such contention, other than at the close of trial to orally find that "Mr. Wolford has no interest in this case, and the Court concludes that the judgment to be entered will not run to him. But instead to the Empeys only." This was carried forward to written conclusion No. VI that "Wolford has shown no facts entitling him

---

**2.** Authority for this sentence, which worded slightly differently is found at p. 1094, is footnoted as § P 4 where the same sentence is found at p. 947, citing as footnote authority *Re*

*Brereton's Estate,* 388 Pa. 206, 130 A.2d 453 (1957), in turn citing Restatement, Restitution § 1.

to a judgment against the defendants." Even before any testimony was taken at trial, the court had remarked:

"[B]ecause of the unusual position of the parties here, **the plaintiff that is, I'm talking about coming to Court originally with an agreement that the plaintiff Wolford would pay the plaintiffs Empey for their loss,** there being no third party complaint for judgment over against Mr. Wolford, there being no motion to dismiss now on the basis that he is not the real party in interest." Tr., Vol. I, pp. 16–17.

Although Finding of Fact No. XXIII, entered after trial, had ruled broadly that "Plaintiffs are the prevailing party," in thereafter settling an objection to the cost bill the court again considered the status of the plaintiff Wolford and the status of the Empeys:

"Although the plaintiffs Empey were awarded the judgment in this case against the defendants Tankersley, **the plaintiff Wolford is in the final analysis the main person benefiting from this action. He signed a promissory note to the Empeys to reimburse them for their loss in the real estate transaction** (which is the subject of this action) which note was conditioned upon the Empeys cooperating with him in this suit to recover the loss from the Tankersleys. The only benefit of this suit to the Empeys is that they have been awarded a judgment giving them the power to collect their loss from the Tankersleys instead of having a promissory note for collection of their loss from Wolford. The court therefore finds that the plaintiffs Empey prevailed as to twenty percent (20%) of the case."

The foregoing, together with the trial court's earlier remark that Wolford was not entitled to a judgment against the Empeys, is as close as the court came to directly ruling on the affirmative defense interposed by the Tankersleys. The court's reasoning, while pointed in the right direction, fell short of its mark. Wolford showed no facts entitling him to a judgment. Yet, at the same time the trial court

saw Wolford as an 80 percent prevailing party.

Demonstrably the district court erred in failing to specifically rule upon the affirmative defense set forth in the Tankersleys' answer to the amended complaint. Because the resolution of that issue as a question of law, and because the district judge has since retired, it is in the sound administration of justice that this Court answer it, there being but one just and equitable conclusion, and one which is based on precedent.

## II.

In *Loomis v. Church,* 76 Idaho 87, 277 P.2d 561 (1954), this Court recognized the doctrine of judicial estoppel. Stated generally, it is simply that a party to litigation cannot change horses in midstream. As stated in *Loomis v. Church, supra,* as applicable to that case, a party litigant cannot obtain a judgment, advantage, or consideration from one party, and thereafter, by repudiating his former allegations or statements, or both, be permitted to attempt a recovery or a right against another, arising out of the same transaction or subject matter, 76 Idaho at 93–94, 277 P.2d at 565. The Court there cited an overwhelming array of authority for that proposition.

Some of those cases see the principle as being in the nature of an election of remedies; others denominate the principle as not strictly a judicial estoppel or an election, but as in the nature of a positive rule of procedure based on manifest justice, and, to varying degrees, on consideration of orderliness, regularity and sound judicial administration.

In *Gohlinghorst v. Reuss,* 146 Neb. 470, 20 N.W.2d 381 (1945), the Nebraska Supreme Court used this language:

"The trial court is not required to helplessly sit by and permit a litigant to play fast and loose with the processes of the court by insisting at different times under oath on the truth of each of two contradictory stories according to the exi-

gencies of the particular occasion presenting itself. Courts must be vigilant in suppressing such schemes for the procurement of benefits by one to the detriment of another.

"A similar situation existed in *Ellis v. Omaha Cold Storage Co.*, 122 Neb. 567, 240 N.W. 760, 763 [1932], wherein it is said: ... A party testifying under oath is more than a mere witness. He is an actor seeking the intervention of the judicial power in his behalf, and thus subject to the rule 'allegans contraria non est audiendus,' which, as stated in Broom's Legal Maxims, p. 130, 'expresses in technical language the trite saying of Lord Kenyon that a man should not be permitted to "blow hot and cold" with reference to the same transaction, or insist at different times, on the truth of each of two conflicting allegations according to the promptings of his private interest.'" The court refused her right to recover on her changed testimony.'" 20 N.W.2d at 383–84.

In *Watkins v. Norfolk & Western Ry. Co.*, 125 W.Va. 159, 23 S.E.2d 621 (1942), the court there saw the principle as properly applied by the trial court, and affirmed a dismissal, saying pertinent here:

"*There are limits beyond which a party may not shift his position in the course of litigation. 'Parties will not be permitted to assume successive inconsistent positions in the course of a suit or series of suits in reference to the same fact or state of facts.' MacDonald v. Long*, 100 W.Va. 551, 131 S.E. 252, 253 [1926]. But here we have more than a mere shifting from one to another theory or legal contention. The change is to a wholly antithetical statement of a fundamental fact in the case. This may sometimes amount to an estoppel, and is always a very potent admission against interest." 23 S.E.2d at 623 (emphasis added).

In *Stretch v. Watson*, 6 N.J.Super. 456, 69 A.2d 596 (1949), the court there used this language:

"A party will not be permitted to play fast and loose with the courts, nor to assume a position in one court entirely different from and inconsistent with that taken by him in another court or proceeding with reference to the very same matter or thing. A party may take alternate positions as to certain matters or things but not inconsistent ones with reference to the very same identical matter or thing. *Cleaves v. Yeskel*, 104 N.J.L. 497, 141 A. 814 [1928]; In re *Allison's Estate*, 106 N.J.Eq. 55, 150 A. 52 [1930]; Id., 107 N.J.Eq. 197, 152 A. 6 [1930]; *In re Walsh's Estate*, 80 N.J.Eq. 565, 74 A. 563 [1909].

"'The rule that a party will not be allowed to maintain inconsistent positions is applied in respect of positions in judicial proceedings. As thus applied it may be regarded not strictly as a question of estoppel, but as a matter in the nature of a positive rule of procedure based on manifest justice and, to a greater or less degree, on considerations of orderliness, regularity, and expedition in litigation. * * * The principle requiring consistency in judicial proceedings is, however, customarily considered a form of equitable estoppel.' 19 Amer.Jur., sec. 72, p. 704, et seq. See also 31 C.J.S., Estoppel, § 117, page 372; 21 C.J., § 227, page 1223, et seq." 69 A.2d at 603.

To the same effect is *Weiss v. Stein*, 209 Mich. 482, 177 N.W. 224 (1920):

"'*The rule that a party will not be allowed to maintain inconsistent positions in judicial proceedings is not strictly one of estoppel, partaking rather of positive rules of procedure based on manifest justice, and to a greater or less degree on considerations of the orderliness, regularity, and expedition of litigation.*'

"At page 702 of the same authority it is said:

"'*It may be laid down as a general rule that a party will not be allowed in a subsequent judicial proceeding to take a position in conflict with a position taken by him in a former judicial proceeding, where the later position is*

to the prejudice of the adverse party, and the parties and the questions involved are the same.'

"At page 703 of the same authority it is said:

" '*Election of Remedies as Estoppel.* —Election of remedies is closely akin to the estoppels now under consideration, sometimes being termed a quasi estoppel. Thus, it is a general rule that if one having a right to pursue one of the several inconsistent remedies makes his election, institutes suit, and prosecutes it to final judgment, or receives anything of value under the claim thus asserted, or if the other party has been affected adversely, such election constitutes an estoppel thereafter to pursue another and inconsistent remedy. And where the right in the subsequent suit is inconsistent with that set up in the former suit, as distinguished from a merely inconsistent remedy, the party is estopped though the former suit may not have proceeded to judgment.' " 177 N.W. at 225 (emphasis added).

In *Johnson v. Marx Levy & Bro.*, 109 La. 1036, 34 So. 68 (1902), the Louisiana Supreme Court said this:

"The law holds parties to their allegations of record. Such averments are the highest evidence against those who make them. Nor will they be permitted to deny or contradict that which they thus solemnly declare in a judicial proceeding. *Gaudet v. Gauthreaux,* 40 La.Ann. 189, 3 South. 645 [1888]; *Williams v. Gilkeson Sloss Co.,* 45 La.Ann. 1017, 13 South. 394 [1893]." 34 So. at 73.

The Tennessee Supreme Court, in *Melton v. Anderson,* 32 Tenn.App. 335, 222 S.W.2d 666 (1949), said of judicial estoppel:

"The doctrine in no sense depends upon prejudice to the party invoking it. Upon the contrary it rests solely on public policy which exalts the sanctity of the oath. The object is to safeguard the administration of justice by placing a restraint upon the tendency to reckless and false swearing and thereby preserve the public confidence in the purity and efficiency of judicial proceedings. *Hamilton v. Zimmerman,* 37 Tenn. 39, 40, 46 [1857]; *Sartain v. Dixie Coal & Iron Co.,* supra [150 Tenn. 633, 266 S.W. 313 (1924)].

. . . .

"This view, it seems to us, overlooks the reason underlying the doctrine of judicial estoppel as it has been developed by a long line of decisions in this state, as said, the rule rests not upon prejudice to the individual, but prejudice to the administration of justice and hence to society, which would result if a litigant were allowed to obtain an advantage for himself, or attempt to do so, by willfully swearing one thing one time, and obtain another advantage, or attempt to do so, by willfully swearing precisely the opposite another time, with no explanation of the inconsistency and with the possibility of prevailing in both instances. To countenance such a situation would be to regard with complacency a violation of the sanctity of the oath, and bring our system into disrepute." 222 S.W.2d at 669.

In *Jensen v. U.S.F. & G. Co.,* 78 Idaho 145, 298 P.2d 976 (1956), the principle was again applied:

"If Hubbard was a purchaser of the wheat, title passed to him not later than at the time of delivery and the obligation to pay the price then or at a time agreed upon attached. Hubbard could not be a purchaser of the grain under obligation to pay the price and at the same time be a warehouseman under obligation to redeliver the grain.

"On the same transaction the plaintiff prosecuted to final judgment his suit against Hubbard to recover upon the theory of sale with title passing to and vesting in the purchaser. In this proceeding he sues to recover from the surety on the theory that Hubbard was not the purchaser of the grain but was a warehouseman or bailee of it with ownership remaining in him. In this suit he attempts to repudiate the theory of sale expressly pleaded in the suit against

Hubbard but at the same time to retain the benefit of that judgment by pleading it as establishing the value of the grain and fixing the liability of the defendant although not a party to that suit. ...

....

"The positions of the plaintiff are directly conflicting and cannot be reconciled. The record in plaintiff's suit against Hubbard estops him from contending or asserting that Hubbard was a warehouseman. Especially apt is the statement of Justice Keeton in *Loomis v. Church*, 76 Idaho 87, 277 P.2d 561, 565: ..." 78 Idaho at 149–50, 298 P.2d at 978–79.

In *Gottesman v. General Motors Corp.*, 222 F.Supp. 342 (D. Hawaii 1963), the principle of *Loomis v. Church, supra,* was recognized as within that court's doctrine of preclusion against inconsistent positions—said by it to be broader than the doctrine of collateral estoppel:

"Although the preclusion doctrine has the same effect of depriving one of his right to assert a claim or defense which otherwise would be available to him, it is based on a different rationale. Preclusion against inconsistent positions is designed to prevent a litigant from leading a court to find a fact one way in one proceeding, and then simply because his interests have changed lead the court to find another way in a subsequent proceeding. *McAuslan v. Union Trust Co.*, 46 R.I. 176, 125 A. 296 (1924). Having received a benefit in the first trial, a party is precluded from changing his position to obtain another benefit in the second trial. Thus the preclusion doctrine as distinguished from collateral estoppel and res judicata, may be invoked by a person not a party to the first suit against one who was a party in that suit. *Rand v. Gillette*, 199 N.C. 462, 154 S.E. 746 (1930). So it was that a county was precluded from urging that certain bonds were not the property of a bank where in a prior suit the county had successfully defended on the ground that the bonds were the property of the bank. *Queenan v. Mays*, 90 F.2d 525 (10th Cir., 1937).

Likewise, a guest in a car was precluded from urging her driver's recklessness where plaintiff had previously effected a settlement of her lawsuit against the owner of the other vehicle involved in the accident wherein she alleged that her driver had exercised due care. *Loomis v. Church*, 76 Idaho 87, 277 P.2d 561 (1954). These two cases are obvious examples of the application of this preclusion doctrine." 222 F.Supp. at 344.

### III.

It is readily seen that the Tankersleys properly raised the affirmative defense of election and estoppel, and that the trial court erred in not applying it. Wolford and the Empeys hailed the Tankersleys into court, *each* party plaintiff claiming to have been damaged by fraudulent conduct on the part of the Tankersleys, and each party plaintiff claiming monies from Tankersleys on alleged undisclosed mistake which resulted in the Tankersleys being unjustly enriched. Each and both of the co-plaintiffs predicated their respective alleged losses on the alleged fact of an agreed settlement of Empeys' losses by Wolford accepting *full liability:*

"As a result of the fraudulent conduct of the defendants, the Plaintiff J.T. Wolford has sustained damages in the amount of $2,000.00 to date. This results from his liability to Plaintiffs C.B. Empey and Ilene B. Empey for their loss due to the defendants' fraudulent actions and the Plaintiff J.T. Wolford's failure to detect these actions."

Paragraph VIII of the fraud count.

"That Plaintiff J.T. Wolford has recognized *full liability* to Plaintiffs C.B. Empey and Ilene B. Empey for damages sustained by them due to the mistake in the preparation of the closing papers.

"That Plaintiff J.T. Wolford has paid the sum of $2,000.00 to date as partial payment for the damages suffered by Plaintiffs C.B. Empey and Ilene B. Empey."

Paragraphs V and VI of the mistake count.

It was on the basis that he had accepted full liability for his fault, and had paid $2,000 to the Empeys that Wolford based his right to sue the Tankersleys, charging them with fraud and undisclosed mistake. When these charges were ruled out, at considerable expense of counsel and deposition costs, then Wolford and the Empeys purported to repudiate their settlement, and purported to change it to a contingent agreement of liability—to be effective only if the Empeys could not recover from the Tankersleys. At this point Wolford and the Empeys changed their positions and contentions. Wolford no longer claimed to be entitled to any damages or restitution, notwithstanding that the Empeys still retained the $2,000 which he had paid on his admitted (to them) and pleaded (in suing the Tankersleys) liability for all of the Empeys' losses. This the courts cannot and do not countenance. The principle of judicial estoppel recognized in *Loomis v. Church* clearly applies. This is especially so where, as the trial court also observed, it was Wolford whose fault occasioned any loss suffered by the Empeys. It was Wolford who accepted liability for such losses, and it was Wolford who wrongfully brought a fraud suit against the Tankersleys, and it was Wolford who would benefit from the judgment the court awarded the Empeys against the Tankersleys.

The record before us makes it entirely clear that the Empeys, on learning of their loss, were offered and accepted full satisfaction from Wolford.[3] And it appears that this settlement of their claim against Wolford was made prior to their having even suggested or intimated any contention that the Tankersleys were also liable for the same loss. While the Empeys thus did not, then, consciously make an election as to whom they would look for recompense, they did accept Wolford's offer, and did accept $2,000 paid on it. Only thereafter did they join Wolford in suing the Tankersleys for fraud and mistake. But at that point in time, the Empeys had no loss to recover. Moreover, it was only *after* the trial court ruled out fraud and mistake that Wolford and the Empeys executed a new agreement—done on January 13, just the very day before trial commenced on January 14.

The new agreement purported to rescind the earlier agreement and cancel the earlier promissory note, and instead of reciting the Empeys' agreement to assist Wolford recited merely the pendency of the civil action which had been brought in the names of the Empeys and Wolford as co-plaintiffs. Under the new agreement Wolford allowed the Empeys to retain the $2,000 payment which had been made, agreed that the loss to the Empeys was $9,431.55 plus accruing interest at seven and one-half percent from October 15, 1978, agreed that Wolford would pay that loss only if the action against the Tankersleys was unsuccessful, but if successful, the Empeys would pay back the $2,000 which had been paid under the note and settlement first entered into.

These subsequent arrangements of the Empeys with Wolford, which took place midstream in their lawsuit against the Tankersleys, which was based upon allegations of Wolford's loss by reason of having accepted full liability, could not in any way alter or affect the posture they had assumed and from which they sought to fix liability upon the Tankersleys.

IV.

Even a cursory review of the record and application of a smattering of basic legal principles demonstrates the untenability of the majority opinion. At one place that opinion declares that "the trial court was correct in finding that no enforceable contract existed," and in another place "it has been determined that no enforceable contract exists. Therefore, since there is no enforceable contract, the acts of the agent can give rise to no contractual liabilities." Not knowing how to describe a judicial misstatement other than as the misstate-

---

**3.** See Appendix, *infra.*

ment which it appears to clearly be, I respectfully point to the trial court's findings of fact and conclusions of law, Appendix B attached hereto, which simply do not contain that statement or anything even vaguely resembling it. The trial court erred in many respects, but it did not purport to apply the doctrine of unjust enrichment on the basis of an unenforceable contract. Nor did it mention the ill-starred case of *Luke v. Conrad*, 96 Idaho 221, 526 P.2d 181 (1974) (which has sired a progeny of equally misconceived decisions involving real estate transactions, concerning which I have written on an earlier occasion). The majority does the district court an injustice in suggesting that it did what it did not do. Nor can the blame be put off onto the respondent's brief. No such contention is therein advanced. But the digression of the majority into the lack of enforceability of the contract, and also the lack of a written contract, is so far-fetched as to be a wholly incomprehensible excursion. This particular real estate transaction was not, nor ever claimed to be, an *executory* contract, but was *a wholly executed contract.* The Tankersleys received their deed and paid their $2,500 and transferred their interest in Mrs. Tankersley's contract receivable, and the deal was wholly consummated, even down to Mr. Wolford taking the commission which he received from his principals, the Empeys. Another error in the majority opinion is the statement that "Mr. Wolford testified that he stated the purchase price to the Tankersleys ...." The district court specifically found that "Wolford has no recollection of telling either or both of the Tankersleys the asking price, but believe he did because he always does." Amended Findings of Fact, No. V, R., p. 98. There was *no* testimony by either Mr. or Mrs. Tankersley that either was told the asking price by Mr. Wolford. The trial court only went so far in Finding V. as to state that "Mrs. Tankersley concedes he *may have* told her the asking price ....": Any witness will make that concession if pressed into, but it is not the equivalent of testifying that the statement was made, that it was heard, and that it

was so understood. All that remains to support the majority opinion's restatement of the facts is the letter from the Tankersleys' attorney stating that at a meeting with Mr. Wolford they "were told by Mr. Wolford that the Empeys were asking approximately $17,000 for this piece of property." As the majority notes, this letter was admitted into evidence, but as the majority fails to note, the letter is not that of the Tankersleys, but of the attorney, and there was no showing that the Tankersleys knew of the contents of the letter before it was sent out. It was at best written hearsay, i.e., the recollection of what *he* understood the Tankersleys to have told him. Moreover, the record shows that the Tankersleys had visited with the attorney who represented Mr. Wolford and the Empeys *prior* to seeking out the aid of an attorney to represent them. Most likely their attorney confused what they told him about the prior discussion with the other attorney— which would have likely included his allegations that Wolford had told them the asking price. In any event, it would be a slim reed on which to hang a critical finding. Nor did the trial court hinge any finding on that letter alone.

In his bench remarks after both sides rested, the court stated it would find that "The next finding, the Tankersleys knew that the Empeys expected to receive seventeen thousand five hundred dollars." He declared this as "a pivotal issue ... very difficult to decide." And immediately explained that he would make the finding "because Mrs. Tankersley concedes that she may have been told that." This concession as to what might have been simply does not come up to the standard of being testimony of an actual fact. Quite the contrary, it demonstrates the invalidity of the trial court findings, and in turn the perpetuation of that error by a majority of this Court.

Adding insult to injury, the trial court, contrary to the rule which prohibits a broker from revealing his listing price, was of the opinion that the Tankersleys should have wanted to know that price and Mr.

Wolford would have volunteered it if he were not asked:

"One other thing that the Court applied in this decision-making process is the probability that I think is borne out by the experience of mankind generally, and that is when you go to buy some real property, about the first thing you want to know is how much are they asking for it. It is just so unusual that you would not be concerned at all with the asking price.

"One other thing that the Court considered is the probability that a realtor would not discuss or carry an offer to his principal without having informed the offeror what the asking price was. He has a duty to his principal to do his best to get the offer up as near the asking price as possible."

Clearly, there was error on this point.

Another major fault in the majority opinion is the failure to consider a major assignment of error: "The trial court, over objection, admitted clearly hearsay evidence ... and based its Findings of Fact and Conclusions of Law, for the most part upon such inadmissible evidence." Not only was this issue addressed in appellant's brief, but it was the first issue to be argued:

"At the outset of the trial of this case, it was made crystal clear that the Defendants objected to the introduction of any evidence by the Plaintiffs that was not within the knowledge of the Defendants, and was therefore, hearsay. A continuing objection was made for the record as well as throughout the trial, specific objections were continuously made as to hearsay evidence being offered by the Plaintiffs. Exhibits' PX 4, 6, 11, 14, 15, 22, 24, 25 and 26 were all objected to as being hearsay and documents not within the knowledge of the Defendants. Also, continuous objections were made to testimony of conversations between the Plaintiffs, which were made without the knowledge of the Defendants. The Trial Court stated it was taking the so called 'liberal view' on the introduction of testimony and evidence in this case. The Court stated, it would be able to eliminate in its decision making process the statements and exhibits, which do not have any basis in law to be considered. The Trial Court in its discretion can perhaps do this, but in doing so it is essential that the Court, in fact, during its decision making process actually eliminate such hearsay evidence that has no basis in law to be admitted.

"This was critical for under the facts of this case, any conclusion to be reached hinges directly upon the knowledge of Tankersleys at the time of the transaction.

"There was no evidence whatsoever in the entire record, that the Tankersleys had any knowledge of the following:

"1. That Empeys had listed their property for $18,000.00.

"2. That Empeys had had their property appraised.

"3. That Wolford had altered Empeys' copy of the Earnest Money Agreement (PX 11), stating a purchase price of $17,500.00.

"4. That there were ever issued at any time any closing statements.

"5. That a title insurance policy was ever ordered or issued.

"In order to speed up the trial, the Defendants stipulated that Mr. and Mrs. Empey expected the sum of $17,500.00, but that such expectation was without the knowledge of the Defendants, Tankersleys.

"No evidence was introduced that Tankersleys had any knowledge at the time of the transaction of what Empeys might have been expecting.

"The court adopted Wolford's testimony that he had no recollection of telling Tankersleys the asking price, but believes he did, because he always does. Adopting such a ridiculous fact, as having done an act because a person always does, would be no different than the statement of a motorist having been hit in an intersection, stating he has no recollection of stopping at the stop sign or

1082

looking in both directions, but he knows that he did because he always does.

"Throughout the Court's Findings of Fact and Amended Findings of Fact and Conclusions of Law, the Court adopts Findings to support its position based purely upon hearsay evidence, that was not within the knowledge of the Defendants. The Court in its Findings and Conclusions states, that Tankersleys intended to offer the sum of $17,582.64 and there is simply no evidence whatsoever in the record to justify any such finding.

"The Court in its Conclusions of Law paragraphs I, II and III merely sets forth additional findings that are certainly not Conclusions of Law or based upon what the law actually is, and certainly such additional findings are not based upon any evidence in the record. The Court even went so far in its Conclusion of Law II, wherein it concluded that Tankersleys accepted the real property *knowing* that under the sales documents they would not have to pay $7,361.21 of the purchase price, which the sellers expected to receive, and which they at the time they made their offer expected to pay. There is not a word of evidence in the entire record that states or even intimates that the Tankersleys had any such knowledge of what the Empeys expected to receive or that they had any knowledge whatsoever from the sale documents as executed between the parties, that they owed the Empeys anything further whatsoever." Appellants' Brief, pp. 17–20.

This assignment of error is well-taken—which leaves me at a loss to understand how the majority can choose to ignore it without submitting some explanation for doing so.

I have already stated, regarding the majority opinion's own finding made in this Court that "no enforceable contract exists," that the transaction which we review became a wholly executed agreement by the deed to the Tankersleys and Mrs. Tankersley's assignment of her contract receivable. Strange indeed, then, is the majority's thought that the acts of Wolford did not bind the Empeys (assuming that such is meant by the statement that "the acts of the agent can give rise to no contractual liabilities") the lack of an enforceable contract apparently being, in the eyes of the majority, a suitable predicate for such a statement. As Justice Shepard's opinion points out, and even as the trial court held in disposing of the fraud and mistake counts, against Mr. Wolford and against the Empeys, the knowledge of Mr. Wolford is imputed to the Empeys. The majority is way afield of the law in saying otherwise on the basis of a purported unenforceable contract—again a conclusion never reached by the trial court, which had specifically refused to consider agency an issue upon which a ruling was necessary:

"COURT: The Court does not believe that there is any agency law which is pivotal here. We are not determining the responsibility of Mr. Wolford or Mr. and Mrs. Empey. We are not involved with any notice to agent, agent's notice to principal problems in this case that I can see. So I don't think there is any agency law that needs to be briefed. The Court believes that there is a question of law involved in this case that is a case of unjust enrichment. The principles of which are that if the tryer of fact finds that the Tankersleys were unjustly enriched, the Court implies a contract and then enforces it. If they came into possession of property or money that an equity in good conscience belongs to the other side that they should return it, Mr. Ryan has pointed to some reinstatement of restitution sections, and the question involved is whether the general equity principles that I have just now articulated control over those restitution principles from the restatement." Tr., p. 344.

Finally, the majority fail to observe the inconsistency in saying that it is unjust for the Empeys to have judgment for the $2,000 already paid them by Wolford, but at the same time letting stand the rest of the judgment. Mr. Wolford had not only paid the $2,000, which did not bother the district court which was willing to let Wol-

ford get it back out of the Tankersleys' purse, but the Empeys also had received and accepted his secured promissory note for their entire alleged loss. And, it was on the basis of that executed settlement that Mr. Wolford gained access to the court system, bringing along the Empeys, together making grossly unfounded charges of fraud against the Tankersleys. It was only on the very day before trial, and after seeing the pleaded affirmative defense (which the trial court refused to consider), that Mr. Wolford managed to persuade the Empeys to purport to "rescind" the wholly executed settlement. While Idaho law does not recognize champerty and maintenance, Idaho law is in accord with the many states which continue to recognize that the goals of champerty and maintenance provisions are still around and well, both defensively and offensively, in the form of actions or defenses based on abuse of process or malicious prosecution of civil actions. Mr. Wolford *never* had a right to sue the Tankersleys, and gained access to the courts only on the basis that both he and the Empeys had been defrauded by misrepresentations of the Tankersleys. An untruth. Mr. Wolford was the sole culprit, and, if the Empeys had a loss, it properly fell on his shoulders. He accepted the loss and that should have been the end of it. The Idaho court system should have never seen this controversy.

The judgment should be reversed with directions to dismiss the complaint, and rule upon the Tankersleys' claim for attorney's fees—both in the trial court and on appeal.

## APPENDIX "A"

DALE SMITH
Attorney at Law
P.O. Box 950
Fruitland, ID 83619
(208) 452-4040

## AGREEMENT

WHEREAS, J.T. Wolford and C.B. Empey and Ilene B. Empey, husband and wife, entered into an agreement dated October 15, 1978, and

WHEREAS, J.T. Wolford signed a promissory note in the amount of Nine Thousand, Four Hundred and Thirty One and 55/100 DOLLARS ($9,431.55) on October 15, 1978 pursuant to that agreement, and

WHEREAS, J.T. Wolford and C.B. Empey and Ilene B. Empey, husband and wife, have filed a civil action in the county of Payette, state of Idaho, being civil action number 7193, and

WHEREAS, the parties desire to rescind that previous agreement entered into on the 15th day of October, 1978 and to cancel the promissory note dated October 15, 1978, and

WHEREAS, J.T. Wolford acknowledges an error in a real estate transaction known as the Empey-Tankersley transaction, and C.B. Empey and Ilene B. Empey may suffer a loss therefrom, and

WHEREAS, J.T. Wolford desires to indemnify C.B. Empey and Ilene B. Empey for any losses they may suffer which are not recovered from Lloyd T. Tankersley and Dora Gennette Tankersley in the civil law suit case number 7193, and

WHEREAS, the parties agree that no double recovery to Empeys is expected or desired and that C.B. Empey and Ilene B. Empey desire only to receive payment from J.T. Wolford in the event and only to the extent such losses are not recovered from Lloyd T. Tankersley and Dora Gennette Tankersley, and

WHEREAS, J.T. Wolford has already made one (1) payment in the amount of Two Thousand DOLLARS ($2,000) on or about November 15, 1978, and

WHEREAS, the payment in the note dated October 15, 1978, being a payment in the amount Five Hundred DOLLARS ($500) plus accrued interest due in November of 1979 has not been made pending the outcome of the civil case number 7193, and

WHEREAS, C.B. Empey and Ilene B. Empey desire to return the Two Thousand DOLLARS ($2,000) payment to J.T. Wolford in the event full recovery is made

▉▉▉▉▉▉▉▉▉▉▉ from Lloyd T. Tankersley and Dora Gennette Tankersley, and

WHEREAS, the amount of original loss to J.T. Wolford is Nine Thousand, Four Hundred, Thirty One and 55/100 ($9,431.55) plus accrued interest at the rate of seven and one-half percent (7½%) from October 15, 1978, now, therefore,

IT IS HEREBY MUTUALLY AGREED AND UNDERSTOOD by and between the parties hereto that an error was made on the Assignment of Contract for a closing dated January 14, 1975, and that J.T. Wolford was the closing agent and that C.B. Empey and Ilene B. Empey may suffer a loss in the amount of Nine Thousand, Four Hundred, and Thirty One and 55/100 DOLLARS ($9,431.55) plus seven and one-half percent (7½%) interest from October 15, 1978 and that J.T. Wolford agrees to pay any portion of the loss not recovered from Lloyd T. Tankersley and Dora Gennette Tankersley through civil case number 7193 in the county of Payette, state of Idaho.

That it is further agreed that J.T. Wolford has heretofore paid unto C.B. Empey and Ilene B. Empey the sum of Two Thousand DOLLARS ($2,000) on or about the 15th day of November, 1978, and in the event full recovery is made from Lloyd T. Tankersley and Dora Gennette Tankersley in case number 7193, C.B. Empey and Ilene B. Empey hereby agree to return the Two Thousand DOLLARS ($2,000) heretofore paid unto them by J.T. Wolford.

In the event full recovery is not obtained from Lloyd T. Tankersley and Dora Gennette Tankersley in case number 7193, then in such an event, J.T. Wolford hereby agrees to pay any such sums not so recovered unto C.B. Empey and Ilene B. Empey at the rate of Two Hundred DOLLARS ($200) per month beginning February 15, 1980 with a like payment to be due on the 15th day of each and every month thereafter until paid in full, the principal balance being Nine Thousand, Four Hundred, Thirty One and 55/100 DOLLARS ($9,431.55) and the interest being seven and one-half percent (7½%) accruing from October 15, 1978. Said payments are to be made directly to C.B. Empey and Ilene B. Empey. Upon the receipt of each and every payment so received by C.B. Empey and Ilene B. Empey, they hereby agree to furnish unto J.T. Wolford a receipt of any and all such payments at the time that such payments are made unto them.

In the event the building housed by Treasure Valley Pawn Shop which is owned by J.T. Wolford is sold, J.T. Wolford agrees to immediately pay any remaining balances due under this agreement upon the closing of such transaction.

Simultaneous to the execution hereof, J.T. Wolford agrees to execute in favor of C.B. Empey and Ilene B. Empey, a promissory note in the amount of Nine Thousand, Four Hundred, Thirty One and 55/100 DOLLARS ($9,431.55) plus interest in the amount of seven and one-half percent (7½%) per annum from October 15, 1978, the original of which shall be attached hereto and made a part hereof the same as if fully set out herein.

It is understood by and between the parties hereto that the said promissory note is payable contingently upon the outcome of the civil case number 7193 and any recovery from said case by either J.T. Wolford and/or C.B. Empey and Ilene B. Empey is to go to C.B. Empey and Ilene B. Empey and any recovery by either party is to be treated as a reduction of the unpaid balance of the unpaid note.

In the event a full recovery is obtained from Lloyd T. Tankersley and Dora Gennette Tankersley, the contingent note is to be considered null and void and the parties hereto agree not to enforce such note.

By the execution of this agreement, the parties hereto hereby revoke and rescind any and all other agreements heretofore entered into by them in which J.T. Wolford agrees to pay to C.B. Empey and Ilene B. Empey for any losses which they may have sustained as a result of their real estate transaction with Lloyd T. Tankersley and Dora Gennette Tankersley, and in particular that agreement dated October 15, 1978.

IN WITNESS WHEREOF, the parties hereto have set their hands this 13th day of January, 1980.

/s/ J.T. Wolford
J.T. Wolford
/s/ C.B. Empey
C.B. Empey
/s/ Ilene B. Empey
Ilene B. Empey

STATE OF IDAHO )
) ss
County of Payette )

January 13, 1980. Before me, the undersigned, a notary public in and for said state, personally appeared J.T. WOLFORD, known to me to be the person so named, and acknowledged to me that he executed the foregoing document as his free and voluntary act and was under no undue influence to do so.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first appearing in this certificate.

/s/ Judy R. Taylor
Notary for the State of Idaho
Residing at: New Plymouth
My Commission Expires: 12/12/81

STATE OF IDAHO )
) ss
County of Payette )

January 13, 1980. Before me, the undersigned, a notary public in and for said state, personally appeared C.B. EMPEY and ILENE B. EMPEY, husband and wife, known to me to be the persons so named, and acknowledged to me that they executed the foregoing document as their free and voluntary act and was under no undue influence to do so.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written in this certificate.

/s/ Judy R. Taylor
Notary for the State of Idaho
Residing at: New Plymouth
My Commission Expires: 12/12/81

## PROMISSORY NOTE

$9,431.55 January 13, 1980
 Fruitland, Idaho

I promise to pay to the order of C.B. EMPEY and ILENE B. EMPEY, at Route # 1, Box 193, New Plymouth, Idaho 83655, NINE THOUSAND, FOUR HUNDRED, THIRTY ONE and 55/100 DOLLARS ($9,431.55) plus interest from October 15, 1978 at the rate of seven and one-half percent ($7\frac{1}{2}\%$) per annum. Principal and interest to be paid as follows:

Terms of payment are on demand and if no demand is made then Two Hundred DOLLARS ($200.00) per month with the first payment due on or before the 15th day of February, 1980 and a like payment due on the 15th day of each and every month thereafter until paid in full.

I agree that in case of default in the payment of any of said installments, such unpaid installment shall bear interest from the date of such maturity until paid at the rate of ten percent (10%) per annum, and if any one of said installments or interest due hereon is not paid within ten (10) days after the same becomes due and payable, the whole of the principal sum then remaining unpaid, together with the interest that shall have accrued thereon, shall forthwith become due and payable at the election of the holder of this note, without notice. If action is commenced to enforce payment of this note, I agree to pay such sums as the Court may affix as attorneys' fees. The maker and endorser hereon jointly and severally waive presentment for payment, demand, protest and notice of protest of nonpayment of this note.

/s/ J.T. Wolford

DATE: 1-13, 1980

## PROMISSORY NOTE

$9,431.55 New Plymouth, Idaho October 15, 1978

I promise to pay to the order of C.B. EMPEY and ILENE B. EMPEY, at Route 1, Box 193, New Plymouth, Idaho 83655, NINE THOUSAND FOUR HUNDRED THIRTY-ONE DOLLARS AND FIFTY-FIVE CENTS payable in lawful money of

 the United States of America, with interest thereon in like money from and after October 15, 1978 until paid, at the rate of 7½ per cent per annum. Principal and Interest to be paid as follows:

Terms of payment are on demand and if no demand is made then $2,000.00 on or before November 15, 1978 and $500.00 plus accrued interest to be due on November 15, 1979 and a like payment of $500.00 plus accrued interest to be due on the Fifteenth day of November each year after until paid in full. The Last payment is to be due, if no demand is made, on November 15, 1993 and the last payment being in the amount of $431.55 plus accrued interest from date of the last payment.

I agree that in case of default in the payment of any of said installments, such unpaid installment shall bear interest from the date of such maturity until paid at the rate of 10 per cent per annum, and if any one of said installments or interest due hereon is not paid within ten (10) days after the same becomes due and payable, the whole of the principal sum then remaining unpaid, together with the interest that shall have accrued thereon, shall forthwith become due and payable at the election of the holder of this note, without notice. If action is commenced to enforce payment of this note, I agree to pay such sums as the Court may affix as attorneys' fees. The maker and endorser hereon jointly and severally waive presentment for payment, demand, protest and notice of protest of nonpayment of this note.

/s/ J.T. Wolford
J.T. WOLFORD

### AGREEMENT

WHEREAS J.T. WOLFORD, as a Real Estate Broker, and C.B. EMPEY and ILENE B. EMPEY entered into a Listing Agreement For The Sale Of Real Property in 1974, and;

WHEREAS C.B. and ILENE B. EMPEY as Sellers and LLOYD F. and DORA TANKERSLEY as Buyers entered into a Receipt And Agreement To Purchase in December, 1974, prepared by J.T. WOL-FORD as real estate agent for the Empeys, and;

WHEREAS said Earnest Money Agreement calls for a purchase price of $17,500.00, and;

WHEREAS J.T. WOLFORD as real estate broker prepared a Real Estate Broker's Closing Statement dated January 14, 1975, and;

WHEREAS said Real Estate Broker's Closing Statement shows C.B. and ILENE B. EMPEY as Sellers and LLOYD F. and DORA TANKERSLEY as Buyers, and;

WHEREAS said closing statement indicates the Sellers receiving a Contract Of Sale on closing in the amount of $15,000.00, and;

WHEREAS the real estate sale was closed by J.T. WOLFORD with the Sellers receiving only an Assignment of Contract in the net amount of $7,638.79, and;

WHEREAS the Sellers were not aware of the error until April, 1978 when the contract received was paid off, and;

WHEREAS J.T. WOLFORD acknowledges the error in the closing transaction and wishes to make payment to the Empeys for the amount not received plus seven and one-half (7½%) per cent interest to date,

THEN IT IS HEREBY AGREED AND UNDERSTOOD

THAT an error was made on the closing statement dated January 14, 1975 by J.T. WOLFORD as real estate broker and as the preparer of the statement.

THAT C.B. and ILENE B. EMPEY have suffered a loss in the amount of $7,361.21 plus interest from January 14, 1975 in the amount of seven and one-half (7½%) per cent per year.

THAT J.T. WOLFORD accepts responsibility for the error and agrees to pay C.B. and ILENE B. EMPEY that amount for the loss occasioned by his error.

THAT said amount is to be paid as soon as possible, but in no event are payments to be less than $2,000.00 due on or before

November 15, 1978 and a payment of $500.00 plus accrued interest since date of last payment. Said $500.00 payment plus accrued interest to begin on November 15, 1979 and to continue until the balance is paid in full.

THAT said payments are to be made directly to C.B. and ILENE B. EMPEY and that the Empeys agree to furnish a receipt to J.T. WOLFORD at the time of each payment.

THAT the building housed by TREASURE VALLEY PAWN SHOP is owned by J.T. WOLFORD and a sale of that building is proposed and that in the event the building is sold, J.T. WOLFORD agrees to immediately pay any remaining balances due under this agreement.

THAT C.B. and ILENE B. EMPEY agree to assist J.T. WOLFORD in any attempts to collect these amounts from LLOYD F. and DORA TANKERSLEY.

_____
J.T. WOLFORD

/s/ C.B. Empey 10–19–79
C.B. EMPEY

/s/ Ilene B. Empey 10–19–79
ILENE B. EMPEY

*11/15/78*

*Original of this Note returned to J.T. Wolford this date*

*Dale Smith*
*J.T. Wolford*

DISTRICT COURT, THIRD JUDICIAL DISTRICT

Pltf's. Exh. "F"

Date 1-14-80

PROMISSORY NOTE

**ADMITTED**

$5,704.29 Fruitland IDAHO, May – 17, 1978

On or before the 2e th day of July, 1978, for value received, I, we, or either of us promise to pay to the order of Clifford B. Empey or Ilene B. Empey

at _____

the sum of Five Thousand Seven Hundred Four and 29/100 _____ DOLLARS

in lawful money of the United States of America, together with interest thereon, in like money, at the rate of 7½ per cent. per annum until paid: And if suit or action is instituted to collect this note or any portion of the principal or interest, we likewise promise to pay a reasonable sum as attorney's fees in such suit or action, in addition to the cost and disbursements usually allowed by law.

Due July 2e, 1978

At _____

No. _____

J.T. Wolford

IDAHO COUNTY FREE PRESS

IN THE DISTRICT COURT OF THE THIRD JUDICIAL
DISTRICT OF THE STATE OF IDAHO, IN AND FOR
THE COUNTY OF PAYETTE

· · · · · · · · · ·

J. T. WOLFORD dba WOL- )
FORD REALTY, and C. B. )
EMPEY and ILENE B. ) Case No. 7193
EMPEY, husband and wife, )
 ) AMENDED
 Plaintiffs, ) FINDINGS OF FACT
 ) AND
vs. ) CONCLUSIONS OF LAW
 )
LLOYD T. TANKERSLEY )
and DORA GENNETTE )
TANKERSLEY, husband )
and wife, )
 )
 Defendants. )

· · · · · · · · · ·

This case was heard by the Court without a jury on January 14 and 15, 1980. The parties waived closing argument and briefs and the Court, after a recess of approximately 45 minutes for the purpose of examining the exhibits and reviewing its notes, announced its major findings and conclusions and its decision.

The decision found plaintiffs entitled to a judgment for $7,443.85 with interest thereon at the rate of 7½% per annum from January 8, 1979, the date of filing the complaint.

The Court now makes its formal findings of fact and conclusions of law and decision, as follows:

## FINDINGS OF FACT

### I

Plaintiff J.T. Wolford at all material times was a licensed real estate broker in the State of Idaho, with an office at Fruitland, Payette County, Idaho.

### II

Plaintiffs C.B. Empey and Ilene B. Empey at all material times were husband and wife and were the owners of approximately four and one-half (4½) acres of land in Payette County with a mobile home and certain other improvements upon it.

### III

On June 13, 1974 the Empeys listed their acreage with Wolford for sale for $18,000.00. The Court finds its reasonable market value on June 6, 1974 to be $15,830.00. On January 12, 1975, the date of sale, its reasonable market value had appreciated 10%, to $17,413.00.

### IV

Thereafter, the defendants Tankersley noticed a Wolford Agency for sale sign while driving by the property and stopped. Mr. Empey then pointed out the boundaries and improvements, but did not discuss the financial details nor communicate the asking, listed or appraised price. The Tankersleys did not come to the property again and did not see, communicate or converse with the Empeys again before the property was sold.

### V

Thereafter, the Tankersleys and Wolford had several meetings and conversations. Wolford has no recollection of telling either or both of the Tankersleys the asking price, but believes he did because he always does. Mrs. Tankersley concedes he may have told her the asking price. Mr. Tankersley testified neither he nor his wife in his presence were told the asking price.

Further, regarding their knowledge of the asking price, a letter from their attorney dated December 18, 1978, states:

He stated that they would need to see Wolford Real Estate Agency if they were interested in purchasing the property. At this time, no mention was made of what the seller's asking price was. The foregoing took place on a Sunday. Within the next day or two, Mr. and Mrs. Tankersley made an appointment to meet Mr. Wolford at his office in the evening. They met with Mr. Wolford and at that time were told by Mr. Wolford that the Empeys were asking approximately $17,000.00 for this piece of property.

I specifically asked Mr. and Mrs. Tankersley if the asking price of $17,000.00

was talked of again, and they replied that it had not been.

## VI

Mrs. Tankersley owned the seller's interest in a Land Sale Contract of certain land in Ontario, Oregon on which the unpaid purchase price was $15,082.64 on December 14, 1974. The interest rate was 7½ percent per annum.

The Tankersleys promised in the Land Sale Contract to pay in full a mortgage on the Oregon property in favor of Pioneer Federal Savings & Loan Association on or before the purchasers performed their part of the contract. The purchasers therein did not agree to assume and pay the mortgage, nor is there any provisions in the contract for the Pioneer Mortgage payment to be deducted from the proceeds received from the purchasers.

## VII

In a Receipt and Agreement to Purchase dated in December, 1974, the Tankersleys offered to purchase the Empeys' acreage for "... $2,500.00 and Assignment of Contract of Sale on property located in the city of Ontario, Malheur County, Oregon ..."

On the purchasers' copy of the Receipt and Agreement the total purchase price in dollars is not set forth. Neither is the unpaid purchase price under the contract of sale nor the principal balance due on the mortgage set forth.

## VIII

Wolford thereafter altered the Receipt and Agreement to Purchase by inserting the words "Seventeen Thousand Five Hundred" and the figures "17,500.00" into the sellers' copy directly above the Tankersleys' signatures, so that it reads:

I hereby agree to purchase the above described property and pay the price of Seventeen Thousand Five Hundred ($17,500.00) Dollars as set forth above and grant to said agent ____ days hereafter to secure Seller's acceptance hereof, dur-

ing which period my said offer shall not be subject to revocation.

Address _____ /s/ Lloyd T. Tankersley
 /s/ Dora Gennette Tankers-
Phone _____ ley Purchaser

## IX

The Tankersleys were not shown a copy of the Receipt and Agreement to Purchase as it read after the alteration, and the Empeys were not shown a copy of it as it read before the alteration.

## X

The Empeys thereafter signed the altered copy of the Receipt and Agreement to Purchase. It was stipulated by the parties that the Empeys expected to receive $17,500.00 for their property.

## XI

The Land Sale Contract of the Oregon property had been placed in escrow with the Land Title Escrow Co. The Escrow Instructions directed the escrow holder to pay Pioneer Federal Savings & Loan $132.50 a month until (it was) paid.

## XII

Mrs. Tankersley authorized Wolford to examine the escrow and the mortgage accounts, which he did. He learned that the unpaid balance on the Land Sale Contract was $15,082.64 and on the mortgage, $7,443.85.

## XIII

Thereafter Wolford took the Receipt and Agreement to Purchase and his notes relating to the Land Sale Contract and the mortgage on the Oregon property to Mr. Dwaine L. Welch, Attorney at Law, Payette, Idaho to draft the documents of transfer.

Mr. Welch drafted an Assignment of Contract which assigned the Tankersleys' interest in the Land Sale Contract of the Oregon property to the Empeys.

The financial details were covered by the following language:

It is further understood and agreed by and between the parties that the unpaid balance of said Contract hereby assigned in the sum of $15,082.64 with the next installment due and payable on the 15th day of January, 1975.

There is also a mortgage lien against said above described property to Pioneer Federal Savings & Loan, the balance of which is $7,443.85; the payments on such mortgage are deducted from the Contract payments in said original Contract and are to be paid to the mortgage holder until said mortgage is paid in full, less the mortgage payments that are provided herein.

Accordingly, the Empeys would receive under the assignment $15,082.64 less $7,443.85 or $7,638.79. This, with the $2,500.00 paid down would come to $10,-138.79, $7,361.21 short of the purchase price the Empeys expected.

In the transfer documents drafted by Mr. Welch, no provision was made by note and mortgage, by contract of sale, or by any other document to secure to the Empeys the shortage of $7,361.21.

## XIV

As a part of the transfer documents, Mrs. Tankersley signed a deed for the purpose of conveying the Oregon property to the Empeys to be used in case the purchasers failed to pay for it. The consideration recited in this deed is $17,500.00.

## XV

The Tankersleys signed the transfer documents.

## XVI

When presented with the transfer documents, the Empeys asked Wolford if they would be paid the full $17,500.00. Wolford assured them they would. Whereupon the Empeys signed the documents.

## XVII

The execution of the sales documents was completed on or before January 12, 1975.

## XVIII

The Tankersleys moved onto the property in June, 1975, made improvements to it, sold it and moved off in January, 1978.

## XIX

The Land Sale Contract was prepaid in full in April, 1978. The Empeys then realized they were not going to receive the full $17,500.00 for their property.

They contacted Wolford who, after checking his papers, paid them $2,000.00 and agreed in writing to pay the remainder of their loss provided they would cooperate in an attempt to collect it from the Tankersleys. Hence, this lawsuit.

## XX

The Tankersleys intended to offer $2,500.00 down and an assignment of their Land Sale Contract, the unpaid principal balance of which they thought to be $15,-082.64.

## XXI

Wolford relied upon his attorney to draft the documents necessary to complete the transaction properly. He was mistaken as to the legal effect of the papers as drafted and honestly believed that the Tankersleys would pay the full purchase price of $17,-500.00 when he assured the Empeys they would receive that amount.

## XXII

The Empeys made demand upon the Tankersleys to pay the deficit on November 22, 1978.

## XXIII

Plaintiffs are the prevailing party.

## CONCLUSIONS OF LAW

### I

Wolford was operating under a mistake of law when he advised the Empeys that

under the sales documents they would receive $17,500.00. He had no fraudulent animus, nor was he employing duress or undue influence. He was merely stating his opinion of the legal effect of the documents, arrived at, in part, by reliance upon his attorney.

## II

The Tankersleys passively accepted the real property, knowing that under the sales documents they would not have to pay $7,361.21 of the purchase price which the sellers expected to receive and which they, at the time they made their offer, expected to pay.

## III

The Tankersleys have been unjustly enriched in the sum of $7,274.21, the difference between the reasonable market value on the date of sale, $17,413.00, and the amount actually paid, $10,138.79, which, in equity and good conscience, belongs to the Empeys.

## IV

The property having been re-sold by the Tankersleys, the Court cannot adjust matters between the parties by ordering it reconveyed to plaintiffs.

## V

The Empeys are entitled to a judgment against the Tankersleys in the sum of $7,274.21 with interest at the rate of eight percent per annum from November 22, 1978, together with costs.

## VI

Wolford has shown no facts entitling him to a judgment against the defendants.

DATED this 2nd day of May, 1980

/s/ Lloyd C. McClintick
LLOYD C. McCLINTICK
District Judge

## ON REHEARING

DONALDSON, Chief Justice.

The petition for rehearing in the above-entitled action was granted and re-argued. The Court has reviewed the record, considered the arguments presented by counsel, and we continue to adhere to the views expressed and the conclusion reached in the earlier opinion.

BAKES, J., concurs.

HUNTLEY, J., concurs in the result.

SHEPARD, J., adheres to his dissent in the earlier opinion.

BISTLINE, Justice, on rehearing.

I continue to dissent on the basis of the earlier opinion above set out. On the rehearing about all that was new was a contention raised by Wolford that he is entitled to be subrogated to the Empeys' cause of action against the Tankersleys. He cites 73 Am.Jur.2d, Subrogation, for that proposition. And that proposition as there stated seems to support his contention, wherein it is found:

"Subrogation in favor of an agent making food a loss to his principal has been allowed under various circumstances, as where he ... makes good a loss to the principal resulting from dealings with third persons.... The fact that an agent was negligent in causing loss to his principal will not defeat his right of subrogation."

For Idaho authority we are cited to *May Trucking Co. v. International Harvester Co.,* 97 Idaho 319, 543 P.2d 1159 (1975), and a case from Washington, *United Boat Builders, Inc. v. Tempo Products,* 1 Wash. App. 177, 459 P.2d 958 (1969). While the authority which I mention, and other in the brief, appears reputable and persuasive, I cannot see in the record that this theory was relied upon or advanced in the trial court, or the first hearing. For those reasons we are not considering it now, or at least I so assume. More apparently, however, four members of the Court all remain firmly entrenched where we were when the rehearing was granted. In that manner,

with two plurality opinions, we have not made any new law; but we have unsettled the law insofar as the precedential value of *Loomis v. Church* is concerned. That case aptly applied to Tankersleys' well-pleaded affirmative defense, an affirmative defense that has now been wholly ignored by the district court in the first instance, and now by most members of this Court. While the case has now been flitting about in this Court almost as long a time as expired before the Empeys discovered that as a result of Wolford's handling of their transaction they had been shorted, it would seem that the plurality of Justices Donaldson and Bakes would attempt to explain away the affirmative defense, not to forget another primary Tankersley contention on appeal, i.e., that the trial court admitted all kinds of evidence, documentary and testimony, which was revelant hearsay.

I am reminded of a case a few years back where attorney Robert C. Huntley, expressed his disfavor with an opinion from this Court by referring us to the shortest passage in the Bible: John 11:35. The Tankersleys and their counsel may perhaps find comfort in the passage found at Luke 23:34.